975 So.2d 1054 (2007)
Troy MERCK, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1902.
Supreme Court of Florida.
December 6, 2007.
Rehearing Denied February 11, 2008.
*1058 James Marion Moorman, Public Defender, and John C. Fisher, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Robert J. Landry, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
Troy Merck, Jr., appeals the death sentence imposed upon him after a second remand for resentencing. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the sentence.

I. FACTS AND PROCEDURAL HISTORY
Troy Merck, Jr., was convicted of first-degree murder following the 1991 stabbing of James Anthony Newton. The facts surrounding the murder are set forth in Merck v. State, 664 So.2d 939 (Fla.1995) (Merck I). The jury recommended a sentence of death, and the trial court followed that recommendation. On October 12, 1995, this Court affirmed Merck's conviction but reversed his death sentence because we found that a North Carolina juvenile adjudication presented to the jury was not a "conviction" within the meaning of the conviction of a prior violent felony aggravator and that admitting evidence regarding this adjudication was harmful error. Id. at 944. On remand in July of 1997, a circuit court jury unanimously recommended a death sentence, which the trial court imposed. On July 13, 2000, this Court again reversed Merck's death sentence because we found that the trial court failed to adequately consider nonstatutory mitigation in its sentencing order and inappropriately *1059 applied the felony probation aggravator, which did not exist at the time of Newton's murder. Merck v. State, 763 So.2d 295, 298-99 (Fla.2000) (Merck II).
Merck's third resentencing proceeding, held in March of 2004 and now before us for review, resulted in a jury recommendation of death by a nine-to-three vote. The trial judge held a Spencer[1] hearing on March 28, 2004. Both the State and the defense presented psychological experts who testified regarding Merck's mental and emotional states at the time of the murder and at the time of the instant resentencing. The defense also introduced into evidence a copy of the 1997 penalty-phase testimony of Ron Bell, Chief Toxicologist for the Pinellas/Pasco County Medical Examiner's Office, who offered an opinion regarding Merck's levels of intoxication and impairment at the time of the murder. After considering this evidence, the trial court followed the jury's recommendation and imposed the death penalty, finding two aggravating factors: the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; and the capital felony was especially heinous, atrocious, or cruel (HAC). The trial court found one statutory mitigating factor, Merck's age of nineteen at the time of the offense, which it assigned some weight. The court further found three nonstatutory mitigating factors: difficult family background, assigned some weight; alcoholism/alcohol abuse-intoxication, assigned little weight; and the capacity to form and maintain positive relationships and the capacity for growth, assigned some weight. State v. Merck, CRC9116659CFANO-C (Fla. 6th Cir. Ct. order filed Aug. 6, 2004) (Sentencing Order).
On appeal, Merck presents six claims: (1) the trial court improperly excluded evidence relating to Merck's presumptive parole release date; (2) the trial court improperly excluded evidence that was relevant to the nature and circumstances of the offense, had bearing on the finding of an aggravating factor, and could have been the basis of additional mitigating factors; (3) the assistant state attorney's closing argument included improper remarks, which denied Merck a fair penalty-phase proceeding; (4) the trial court failed to find or gave too little weight to mitigating factors; (5) the death sentence is disproportionate; and (6) Florida's capital sentencing scheme violates the decisions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

II. EXCLUSION OF EVIDENCE CLAIMS

A. Exclusion of Parole Expert Testimony
Merck argues that the trial court erred in excluding proffered expert testimony regarding Florida's parole procedures and his likelihood of being paroled. Because this murder occurred in 1991, the resentencing jury was instructed that Merck could be sentenced to death or to life in prison without the possibility of parole for twenty-five years.[2] Merck contended that the 2004 resentencing jury would unduly consider that he could be *1060 paroled twelve years from the date of its sentencing recommendation. Thus, the defense wanted to present as a witness Felix Ruiz, Regional Administrator in the Tampa Bay Area for the Florida Parole Commission, to testify as to the unlikelihood of Merck actually being paroled. The State objected that this testimony was "wildly speculative" and irrelevant because the State would not be drawing the jury's attention to the fact that Merck would be considered for parole in 2016 if he was given a life sentence. The defense argued that this testimony was relevant to the mitigating circumstance of length of sentence.
The Court addressed the admissibility of evidence about a defendant's likelihood of parole in Jackson v. State, 530 So.2d 269 (Fla.1988), where the defendant argued that the trial judge erred in prohibiting him from presenting as a mitigating circumstance the philosophy of the then-existing parole commission not to grant parole to defendants convicted of capital offenses. The Court found that the trial judge did not abuse his discretion because such evidence did not concern the appellant's character and it was "probable that none of the present parole commission would be serving at the time Jackson could be eligible for parole in twenty-five years had a life sentence been imposed." Id. at 274.
Likewise, in King v. Dugger, 555 So.2d 355, 359 (Fla.1990), this Court found no error where a trial court excluded testimony by the Executive Director of the Florida Parole and Probation Commission that a life sentence for first-degree murder includes a minimum mandatory sentence of twenty-five years of imprisonment because such evidence was not relevant to King's character, his prior record, or the circumstances of the crime. This Court held that the "standard instruction on the possible sentences for first-degree murder adequately inform[s] the jury of the minimum mandatory portion of a life sentence." Id. That same year, this Court found no error in Lucas v. State, 568 So.2d 18, 20 n. 2 (Fla.1990), where the trial court refused to allow Lucas to present testimony that he would not be paroled if sentenced to life imprisonment.
Given these precedents, we find that the trial court did not abuse its discretion in excluding the proffered testimony.[3]

B. Evidence of Circumstances of the Murder
In this claim, Merck argues that the trial court erred in excluding defense evidence regarding the circumstances of the murder. He claims that the trial court improperly excluded testimony that would tend to show that he did not fatally stab the victim and that his involvement in the crime was minor.
The record reflects that except for the testimony identified below that was not proffered, the allegedly excluded testimony was presented to the jury. Contrary to Merck's argument on appeal, the jury heard that Neil Thomas illegally bought alcoholic drinks for an underage Merck on *1061 the night of the murder. Thomas testified that he, not Merck, called the victim a "pussy" and that the victim's subsequent refusal to fight may have been perceived by Merck as disrespectful and annoying. Thomas testified that he drove Merck away from the crime scene and that they changed clothes so that they would be less recognizable, hid from the police in some bushes, and played pool together later that night. Finally, Thomas testified that he had not been charged with any crime regarding Newton's murder, denied being given preferential treatment, and explained the prosecuting attorney's role in and the circumstances surrounding his release after turning himself in to police in 1997 on a 1994 arrest warrant.
Merck argues that the trial court excluded potentially exculpatory testimony by a fingerprint examiner and evidence that eyewitness Katherine Sullivan's description of the stabber's clothing matched Thomas's clothing, not Merck's. The record does not contain a proffer of such testimony. Thus, we deny Merck's claim.[4]See Lucas v. State, 568 So.2d 18, 22 (Fla. 1990) ("A proffer is necessary to preserve a claim such as this because an appellate court will not otherwise speculate about the admissibility of such evidence.").

III. CLOSING ARGUMENTS
Merck argues that he was denied a fundamentally fair penalty phase because the prosecutor made numerous improper comments during closing arguments. Attorneys are permitted wide latitude in closing arguments but are not permitted to make improper argument. Gore v. State, 719 So.2d 1197, 1200 (Fla.1998). Closing argument is an opportunity for counsel to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Counsel must contemporaneously object to improper comments to preserve a claim for appellate review. Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error. The Court considers the cumulative effect of objected-to and unobjected-to comments when reviewing whether a defendant received a fair trial. Brooks v. State, 762 So.2d 879, 898-99 (Fla.2000). A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion. Dufour v. State, 905 So.2d 42, 64 (Fla.2005). We look at the closing argument as a whole to determine whether that discretion was abused.
In this case, defense counsel made one contemporaneous objection to the prosecutor's closing argument, which the trial court overruled. The defense objected to the prosecutor making an impermissible "mercy" argument when the prosecutor stated:

*1062 The Defense will be talking to you about what we call mitigation. Things about [Merck's] background they believe should warrant you affording him some mercy that he never afforded Mr. Newton.
The prosecutor revisited this subject at the close of his argument, stating:
What [Merck] did here, there should be no mercy for a merciless crime, ladies and gentlemen. On behalf of the People of [the] State of Florida and Jim Newton, I ask you all to recommend that he die.
This Court has repeatedly condemned mercy arguments that ask the jury to show to the defendant the same amount of mercy as the defendant showed to his or her victim. See, e.g., Brooks, 762 So.2d at 901; Urbin v. State, 714 So.2d 411, 421 (Fla.1998); Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992); Rhodes v. State, 547 So.2d 1201, 1206 (Fla.1989). The defense's objection to the mercy argument should have been sustained. The trial court erred in allowing this argument. However, because the mercy comments were not dwelled upon or emphasized in the context of the entire closing, we conclude that the trial court's error does not require reversal. We have previously held that a mercy argument standing alone does not constitute reversible error. See Reed v. State, 875 So.2d 415, 438 (Fla.2004).
Merck also urges in this appeal that the Court find that the prosecutor made several improper "golden rule" arguments. Golden rule arguments are arguments that invite the jurors to place themselves in the victim's position and "imagine the victim's final pain, terror and defenselessness," and have long been prohibited. Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985). No objection was made to these alleged golden rule arguments during trial. Specifically, Merck challenges the following statements made by the prosecutor during closing argument:
The Defendant was described to you today as a kind man, a man with positive values. One has to wonder on October 11, 1991, how kind Jim Newton felt when the Defendant jabbed this into his throat and twisted it. Twisted it until blood squirted out of his neck, as the Defendant described it, like a squirt gun. . . .
. . . .
. . . [I]sn't this among the worst ways to die that anyone can imagine? This is one of the worst most aggravated murders. . . .
. . . .
. . . How did that feel to have a knife penetrate his skull?. . . .
Now. That's one minute. How many thoughts went through your mind in that one minute? Did he live two minutes? Did he live three minutes? Four minutes? Enough time for his life to go, roll his eyes, to think about the people that he would never see again. Was that an unnecessarily torturous way for the man to lose his life that night for no good reason?
Again, we consider these arguments not in isolation but in the context in which the statements were made.
Each of these comments was made in the context of arguing that the evidence supported finding the HAC aggravating factor and that the aggravating factors should be found to outweigh the mitigating factors. The first statement, when placed in context, responds to the defense's presentation of mitigating evidence and relates to the HAC aggravating factor:
The Defendant was described to you today as a kind man, a man with positive values. One has to wonder on October *1063 11, 1991, how kind Jim Newton felt when the Defendant jabbed this into his throat and twisted it. Twisted it until blood squirted out of his neck, as the Defendant described it, like a squirt gun. Was that the man that you heard these people describing to you today? Was that the person whose life's decision had brought him to that point? That was not the boy in the donkey suit singing a song in the parking lot that night, it was a grown man deciding to take another man's life in a gruesome, painful, heinous, atrocious, and cruel manner.
Similarly, the next two challenged prosecutorial comments were made in direct response to defense counsel's argument during opening statement that the murder was "an awful crime, but it [was] not by any means the worst" because it was sudden and quick:
Mr. Watts, when he made his opening remarks to you, said this is only for the most aggravated murders. I'm sure that  I know that there are probably more painful and probably worse murders, but isn't this among the worst ways to die that anyone can imagine? This is one of the worst most aggravated murders. I submit from bringing up the incidents in his childhood, his age, alcohol use, least mitigated.
The final two comments arose in the context of recounting the testimony of the medical examiner and of the eyewitnesses who described the victim's "awareness, his pain, and his last moments." The prosecutor stated:
The doctor said that, well, really he could not remain conscious for more than a few minutes. Maybe a minute, maybe two or three would not be, but long enough, ladies and gentlemen, to be torturous. . . . First of all, he had the wounds to his back, then he gets them to the chest, and then he is jabbed in the throat and it is twisted. How did that feel to have a knife penetrate his skull? I don't care how much alcohol he has had. Then he just started slashing at his face. The doctor told you about the nerve endings. It is possible that those smaller incise wounds could be just as painful as some of the big ones. . . . He is grasping at his throat, moaning, kicking, holding his throat. The doctor told you that actually pressure could slow down the bleeding. Those were the last few minutes of his life. And a minute doesn't sounds [sic] like much, ladies and gentlemen, but for some reason companies all over the world pay millions of dollars for a few minutes of commercials, for instance, during the Superbowl. It is a long time.
Now. That's one minute. How many thoughts went through your mind in that one minute? Did he live two minutes? Did he live three minutes? Four minutes? Enough time for his life to go, roll his eyes, to think about the people that he would never see again. Was that an unnecessarily torturous way for the man to lose his life that night for no good reason?
Again, the trial transcript reflects that the prosecutor's arguments were all made in support of the State's position that the HAC aggravating factor was established by the evidence and supported a recommendation of death.
The Court recently discussed somewhat similar arguments in Rogers v. State, 957 So.2d 538, 549 (Fla.2007). In that case, the prosecutor argued:
We know that she knew she was going to be killed, . . . we know when she was stabbed the first time, she didn't become unconscious; she remained conscious and she could feel the pain of the knife going through her body and could feel *1064 the pain of the knife as it was twisted and pulled out of her body, and then he did it again.
. . . .
What weight do you give to the ten, twenty minutes where she was there in that bathroom reflecting back on her life, on the things that she hadn't done that she wished she could, the opportunities that had never been presented to her, on her children that she would never see again, on her mother who loved her so dearly. . . .
The Court found that these "arguments were not improper because they were based upon facts in evidence  the victim was stabbed twice, she struggled with her assailant, and she remained alive for at least a short period of time after being stabbed." Id. We explained that "a common-sense inference as to the victim's mental state" may be the basis of proper argument. Id. (quoting Banks v. State, 700 So.2d 363, 366 (Fla.1997)). Such arguments are not improper golden rule arguments because they do not attempt to place the jury in the position of the victim.
Similarly, in the instant case, we do not find that the prosecutor's arguments were improper given their context, and thus we do not find fundamental error. The first four comments described the victim's injuries and suffering based on facts in evidence and common-sense inferences from those facts. The final comment was designed to illustrate that one minute can be a significant period of time. While one of the comments did invite the jurors to vividly imagine how long a minute could feel, it did not invite the jurors to place themselves in the victim's position and "imagine the victim's final pain, terror and defenselessness." Bertolotti, 476 So.2d at 133.
Next, Merck challenges the prosecutor's arguments to the jury regarding how many books and Penthouse magazines the victim could have read since 1991 and the prosecutor's denigration of Merck's reading books while in prison as a part of a mitigation strategy by Merck's counsel. Merck is correct that we and the district courts have held that such prosecutorial comments are improper. See, e.g., Taylor v. State, 583 So.2d 323, 329-30 (Fla.1991) (holding comment that victims could no longer read books and engage in other activities was improper because it urged consideration of factors outside scope of deliberations); Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988) (holding verbal attacks on personal integrity of opposing counsel are unprofessional and inconsistent with prosecutor's role). However, the prosecutor's comments in this case were not the sort of pervasive errors that compromise the integrity of the penalty-phase proceeding and thus were not fundamental errors.
In sum, after considering the prosecutor's closing argument as a whole, we do not find that the objected-to error and the unobjected-to improper arguments cumulatively resulted in reversible error. Merck received a fair penalty-phase proceeding and is not entitled to relief on this claim.

IV. MITIGATING FACTORS
Merck argues that the trial judge erred by failing to find two statutory mitigating factors: that Merck was under the influence of extreme mental or emotional disturbance; and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired at the time of the stabbing. A trial judge may reject a claim that a mitigating circumstance has been proven, provided that the record contains competent, substantial evidence to support the rejection. Franqui v. State, 804 So.2d 1185, 1196 (Fla.2001) *1065 (citing Mansfield v. State, 758 So.2d 636, 646 (Fla.2000)). A trial court's rejection of a proposed mitigating factor will be upheld on appeal so long as competent, substantial evidence exists to support the rejection. Banks v. State, 700 So.2d 363, 368 (Fla. 1997); see also Willacy v. State, 696 So.2d 693, 696 n. 6 (Fla.1997) (noting that Court's appellate review function does not involve reweighing or reevaluating evidence of aggravating and mitigating circumstances, and receding from prior cases to extent that they indicated otherwise). After reviewing the record, we find that the trial judge did not abuse his discretion in rejecting the proposed mitigating factors because his findings are supported by competent, substantial evidence.
First, competent, substantial evidence supports the trial judge's finding that Merck's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired. Katherine Sullivan, a friend of the victim who witnessed the stabbing, testified that Merck successfully caught keys thrown to him just moments before the stabbing, despite his alleged alcohol consumption, and that Merck did not have any trouble walking at the time of the murder. Neil Thomas, Merck's companion on the night of the murder, testified that Merck did not have any trouble walking or talking as a result of his alcohol consumption. Merck's efforts to evade police after the stabbing, such as abandoning the car, changing clothes, and hiding in bushes, indicate that he was not too drunk to appreciate the criminality of his actions. Finally, Dr. Sloman, the State's expert psychologist, testified that he did not believe that impairment from Merck's personality disorder or his alcohol consumption rose to the level of this statutory aggravator because he concluded that Merck made conscious decisions to behave as he did.
Second, competent, substantial evidence supports the trial judge's finding that the capital felony was not committed while Merck was under the influence of extreme mental or emotional disturbance. While Dr. Maher, the defense's expert psychiatrist, testified that he believed Merck was experiencing extreme mental or emotional turmoil at the time of the crime, Dr. Sloman testified that he did not believe that Merck was experiencing extreme mental or emotional distress at the time of the crime. When experts disagree, the trier of fact is entitled to resolve the resulting factual issue. See Walls v. State, 641 So.2d 381, 390 (Fla.1994). Here, the trial court gave greater weight to Dr. Sloman's testimony. Questions relating to evidentiary weight are within the province of the circuit court, and this Court will not reweigh the evidence on appeal. Trotter v. State, 932 So.2d 1045, 1050 (Fla.2006). We defer to the trial judge's finding that this mitigating factor was not established because his finding was supported by Dr. Sloman's testimony.
Merck also argues that the trial judge erred by not weighing more heavily the nonstatutory mitigating factors that were found to be established. This Court reviews a trial court's assignment of weight to proven mitigating factors under an abuse-of-discretion standard. Again, we do not reweigh the aggravating and mitigating factors. We defer to the trial court's determination "unless no reasonable person would have assigned the weight the trial court did." Rodgers v. State, 948 So.2d 655, 669 (Fla.2006), cert. denied, ___ U.S. ___, 128 S.Ct. 59, 169 L.Ed.2d 50 (2007) (No. 06-10961). And "while a proffered mitigating factor may be technically relevant and must be considered by the sentencer . . . the sentencer *1066 may determine in the particular case at hand that it is entitled to no weight for additional reasons or circumstances unique to that case." Trease v. State, 768 So.2d 1050, 1055 (Fla.2000) (receding from holding in Campbell v. State, 571 So.2d 415 (Fla.1990), that disallowed trial court assigning no weight to established mitigating factors).
Here, the trial judge described Merck's difficult childhood and noted Merck's apparent effort to make "the best of" being in prison before assigning those mitigating circumstances "some weight." He also explained in detail his reasons for finding that the mitigating circumstance of Merck's alcoholism and his alcohol consumption on the night of the murder merited only little weight. Again, after reviewing the record, the trial judge's assignments of weight to the established mitigating factors do not appear unreasonable or arbitrary given the entirety of the evidence presented. Thus, we find this claim is without merit.[5]

V. PROPORTIONALITY
Merck next asserts that his death sentence is disproportionate. "To determine whether death is a proportionate penalty, we consider the totality of the circumstances of the case and compare the case with other capital cases where a death sentence was imposed." Seibert v. State, 923 So.2d 460, 473 (Fla.) (citing Pearce v. State, 880 So.2d 561, 577 (Fla.2004)), cert. denied, ___ U.S. ___, 127 S.Ct. 198, 166 L.Ed.2d 162 (2006). Considering the totality of the circumstances surrounding this case, the aggravating and mitigating circumstances, and other similar cases, the death sentence imposed upon Merck is proportionate.
In this case, the trial court found two aggravating factors, conviction of a prior violent felony and HAC, which it compared to Merck's age of nineteen at the time of the offense and several nonstatutory mitigating factors, including Merck's difficult family background, his alcoholism and alcohol use on the night of the murder, and his capacity to form and maintain positive relationships. This Court has found the death penalty proportionate where the prior violent felony and HAC aggravating factors are proven, even in cases more heavily mitigated than Merck. See, e.g., Singleton v. State, 783 So.2d 970 (Fla.2001) (holding death sentence proportionate in stabbing death where trial court found prior violent felony and HAC aggravating factors and substantial mitigation, including extreme mental or emotional disturbance; impaired capacity to appreciate criminality of conduct or to conform conduct to requirements of law; age of sixty-nine at time of offense; under influence of alcohol and possibly medication at time of offense; alcoholism; mild dementia; attempted suicide; honorable military service; and model prisoner during prior sentence); Spencer v. State, 691 So.2d 1062, 1066 (Fla.1996) (holding death sentence proportionate where trial court found prior violent felony and HAC aggravating factors and proven mitigation included extreme mental or emotional disturbance; impaired capacity to appreciate criminality of conduct or to conform conduct to requirements of law; drug and alcohol abuse; paranoid personality disorder; sexual *1067 abuse; honorable military record; good employment record; and ability to function in structured environment). Based on the foregoing, we find that Merck's death sentence is proportionate under Florida law.

VI. RING CLAIM
Finally, Merck asserts that Florida's capital sentencing scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This Court addressed the constitutionality of Florida's capital sentencing scheme in light of those decisions in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002), and denied relief. Moreover, we have previously rejected each of Merck's specific arguments regarding the constitutionality of Florida's capital sentencing scheme. See State v. Steele, 921 So.2d 538, 543 (Fla. 2005) (stating State must prove at least one aggravating circumstance beyond reasonable doubt to support death sentence); Parker v. State, 904 So.2d 370, 383 (Fla. 2005) (holding jury may recommend death by majority vote); Lynch v. State, 841 So.2d 362, 378 (Fla.2003) (holding defendant not entitled to notice of aggravators in indictment because aggravators are clearly listed in statutes); Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003) (holding jury not required to make specific findings of aggravating circumstances). Finally, one of the aggravating circumstances found by the trial court in this case was Merck's prior conviction of a violent felony. This Court has held that the requirement that the jury make all of the findings necessary to enhance a defendant's sentence is satisfied where one of the aggravators is the prior violent felony aggravator. See Patton v. State, 878 So.2d 368, 377 (Fla.2004) ("The existence of this prior violent felony aggravator satisfies the mandates of the United States and Florida Constitutions. . . ."). Thus, Merck is not entitled to relief.

VII. CONCLUSION
For the reasons stated above, we find most of Merck's claims to be either unpreserved or without merit. Regarding the prosecutor's closing statement, we are deeply troubled by this prosecutor's failure to abide by this Court's prior rulings. However, we do not find that the cumulative effect of the objected-to and unobjected-to comments rise to the level of fundamental error. Accordingly, we affirm Merck's death sentence.
It is so ordered.
LEWIS, C.J., and WELLS, CANTERO, and BELL, JJ., concur.
PARIENTE, J., dissents with an opinion, in which ANSTEAD and QUINCE, JJ., concur.
PARIENTE, J., dissenting.
The question presented is how many times will this Court condemn a specific closing argument and how bad does a closing argument have to be before we will reverse a verdict based on improper prosecutorial comment. In my view, the cumulative effect of multiple improper closing arguments, many of which have been repeatedly condemned by this Court, unquestionably crossed the line in this case and should not be tolerated by this Court. Combined with using a completely improper mercy argument that has been condemned as far back as 1989, the prosecutor's numerous impermissible closing arguments that repeatedly denigrated the mitigation presented denied Merck a fundamentally fair penalty phase.
*1068 Reversal is further required in light of the trial court's error in refusing to allow expert testimony on the parole process in Florida, leaving the jury with the misimpression that Merck would be paroled after twenty-five years, an important point in this case because this crime occurred in 1991. We have allowed such testimony in other death penalty proceedings. See, e.g., Hartley v. State, 686 So.2d 1316, 1319 (Fla. 1996). The prejudice to the defendant from the trial court's failure to allow the proffered evidence is demonstrated by the jury's request for additional instructions on whether Merck's time served would count toward a sentence of life without possibility of parole for twenty-five years, and asking when the twenty-five year period would begin.
As to the closing argument issue, as the majority recognizes, attorneys are permitted wide latitude in closing arguments, but they are not permitted to make improper argument. See Gore v. State, 719 So.2d 1197, 1200 (Fla.1998). More importantly, in death cases "both the prosecutors and courts are charged with an extra obligation to ensure that the trial is fundamentally fair in all respects." Id. at 1202. As we have reiterated over the years, this Court expects "prosecutors, as representatives of the State, to refrain from inflammatory and abusive argument, maintain their objectivity, and behave in a professional manner." Id. (citing Urbin v. State, 714 So.2d 411, 418-22 (Fla.1998); Campbell v. State, 679 So.2d 720, 725 (Fla.1996); Nowitzke v. State, 572 So.2d 1346, 1356 (Fla.1990); Garron v. State, 528 So.2d 353, 359 (Fla. 1988); Bertolotti v. State, 476 So.2d 130, 133 (Fla.1985); Adams v. State, 192 So.2d 762, 764-65 (Fla.1966)).
These admonitions are especially important in the penalty phase of a capital case where often the nature of the crime, coupled with images of the victim being viciously murdered, makes the concept of mitigation difficult for the jury to accept. That is why it is critical that the prosecutor, as an officer of the court, not make arguments that are inflammatory, especially ones that suggest that the death penalty should be imposed simply because the defendant killed another human being. That is not the law in this State or in this country, as repeatedly spelled out by the United States Supreme Court decisions both interpreting the death penalty in light of the Eighth Amendment's prohibition against cruel and unusual punishment and recognizing the importance of mitigation in death penalty proceedings. The Constitution requires individualized sentencing in capital cases in which the circumstances of each case and each individual defendant must be considered. See Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Prosecutorial comments arguing that no mercy should be given to one who has shown no mercy fly in the face of the constitutional requirement that the penalty recommendation in each case be made on the basis of its individual facts and circumstances. Moreover, an argument exhorting the jury to show the defendant the same mercy as the defendant showed the victim is in essence a demand for vengeance. The State's role in a criminal prosecution is not to seek vengeance but to seek justice under our controlling law. This type of comment "violates the prosecutor's duty to seek justice, not merely `win' a death recommendation." Urbin, 714 So.2d at 422 (quoting Bertolotti, 476 So.2d at 133).
Topping the list of egregious comments in this case is the prosecutor's impermissible mercy argument, which the majority agrees was improper, and which was objected to and permitted by the trial court without admonition to the jury:

*1069 The Defense will be talking to you about what we call mitigation. Things about [Merck's] background they believe should warrant you affording him some mercy that he never afforded Mr. Newton.
The defense contemporaneously objected to this comment and asked that it be stricken from the record but the trial court overruled the objection. This ruling was unquestionably erroneous because this Court, as far back as 1989, has condemned the argument that asks the jury to show the defendant the same amount of mercy as the defendant showed his or her victim. See, e.g., Brooks v. State, 762 So.2d 879, 901 (Fla.2000); Urbin, 714 So.2d at 421; Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992); Rhodes v. State, 547 So.2d 1201, 1206 (Fla.1989). This type of comment is "an unnecessary appeal to the sympathies of the jurors[,] calculated to influence their sentence recommendation." Urbin, 714 So.2d at 421 (quoting Rhodes, 547 So.2d at 1206). In Urbin, the Court found this type of argument "blatantly impermissible" given precedent such as Rhodes and Richardson:
If you are tempted to show this defendant mercy, if you are tempted to show him pity, I'm going to ask you to do this, to show him the same amount of mercy, the same amount of pity that he showed Jason Hicks on September 1, 1995, and that was none.
714 So.2d at 421. We have stated before, and I am compelled to do so here again, that "[t]his line of argument is blatantly impermissible." Urbin, 714 So.2d at 421. The prosecutor violated his duty to, above all, seek justice by making a clearly impermissible argument.
There is no question that the prosecutor should have known that the argument was impermissible and the trial judge should not have allowed the prosecutor to get away with this remark. Instead, as a result of the trial court overruling the objection, the prosecutor revisited this same argument at the end of the closing:
What [Merck] did here, there should be no mercy for a merciless crime, ladies and gentlemen. On behalf of the People of [the] State of Florida and Jim Newton, I ask you all to recommend that he die.
I acknowledge that the prosecutor's mercy argument was the only prosecutorial comment objected to by the defense. But I would point out that the impermissible mercy argument to which defense counsel did object occurred near the beginning of the closing argument and was unsuccessful. While not an excuse for the defense counsel failing to object, it is possible that counsel may have been reluctant to continue to object after his objection to this clearly impermissible argument was immediately overruled. Although in my view this single unobjected-to closing argument cannot be considered harmless beyond a reasonable doubt in the context of this case, when reviewing closing arguments this Court considers the cumulative effect of all improper arguments, including the objected-to and unobjected-to closing arguments. See Brooks, 762 So.2d at 898-99 (considering cumulative effect of numerous instances of both objected-to and unobjected-to improper prosecutorial comment).
Merck also complains that the prosecutor improperly denigrated the defense's mitigation case, which is prosecutorial misconduct we have condemned in the past. Most disturbingly, the prosecutor suggested that it was a mere strategy instigated by defense counsel to have Merck read literature and science books while in prison and then assert that he had matured and changed as a result of this reading. Specifically, the prosecutor argued:

*1070 They want you to believe that this man that you heard testify today is the new Troy. This is not the Troy that taught Jim Newton how to bleed. He is reading books. He is not the only person in the jail that is of above average intelligence, he is not the first person to read a book in jail. He is reading Steinbeck now, books on science, great literature. It is interesting that his lawyer with 20 years of experience thought we have this proceeding coming up here, while we are waiting. Why don't you read these books. I'm sure that you are bored in your solitary cell there. I guess we can go and tell a jury that you are reading these books. Could I be so cynical to say that that was all by design? Maybe so. It is a strategy, is what I'm saying.
There was no evidence from which to infer that Merck's reading was his attorney's idea. The prosecutor's suggestion that Merck's reading was a manufactured strategy rather than self-education was without foundation and disparaged defense counsel as having contrived mitigating circumstances. Verbal attacks on the personal integrity of opposing counsel are inconsistent with the prosecutor's role and are unprofessional. Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988); see also Clark v. State, 881 So.2d 724, 726-27 (Fla. 1st DCA 2004) (finding new trial warranted where prosecutor suggested that defense counsel manipulated evidence); Servis v. State, 855 So.2d 1190, 1193-94 (Fla. 5th DCA 2003) (finding cumulative effect of many improper comments, including suggestion that defense counsel was throwing whatever they could against the wall to see what "sticks," constituted fundamental error); D'Ambrosio v. State, 736 So.2d 44, 48 (Fla. 5th DCA 1999) (finding fundamental error due to several improper comments, including comment that defense counsel was trying to inundate jury in "the sea of confusion"). This Court likewise disapproves of such arguments by the State, which serve only to foster doubt in the jury as to the reliability of what defense counsel tells them.
This argument was part of another theme the prosecutor undertook to denigrate the proffered mitigation, arguing to the jury that "alcohol is not mitigation" and that Merck's background cannot diminish what he did to the victim.[6] In Urbin, we expressly condemned prosecutorial disparagement of proffered mitigation relating to the defendant's childhood. 714 So.2d at 421. In Brooks, we condemned prosecutorial disparagement of mitigation when it was characterized as "flimsy" or "phantom" or "excuses." 762 So.2d at 904 (citing Urbin, 714 So.2d at 422 n. 14). The prosecutor improperly disparaged Merck's mitigation in a similar manner in this case.
The prosecutor then impermissibly asked the jury how many books and Penthouse magazines the victim could have read if the victim had not been murdered, another example of a completely impermissible emotional appeal to the jury. This Court has previously held that comments that the murder victim can no longer read books and do other activities is improper because it urges consideration of factors outside the scope of deliberations. See, e.g., Jackson v. State, 522 So.2d 802, 809 (Fla.1988). This comment was made in *1071 the context of belittling Merck's effort to become educated through reading and also implied that Merck had been reading Penthouse in prison, another fact not in evidence.
There were at least two instances where the prosecutor simply invented evidence. For example, no witness testified that Merck had "Mom" tattooed on his arm. Only the prosecutor "testified" to this detail. Perhaps even more disturbing, the prosecutor, without any evidentiary basis, argued that Merck observed a fake orgasm contest the night of the murder by stating that his mitigation witnesses saw Merck as the little boy that they knew and "not the guy who spent the night drinking and watching the fake orgasm contest and decided that he was going to teach Mr. Newton how to bleed in the parking lot." (Emphasis supplied.) Clearly, comments on matters not in evidence are improper. Pagan v. State, 830 So.2d 792, 813 (Fla.2002); Pope v. Wainwright, 496 So.2d 798, 803 (Fla.1986) (citing ABA standards for Criminal Justice 3-5.8(d) (2d. ed.1980)). Together with the reference to Penthouse magazine, the prosecutor's attempt to inject a sexual element into this case seems particularly egregious because during a pretrial hearing the trial judge explicitly excluded testimony that Merck purportedly stated that he derived sexual gratification from killing as being more prejudicial than probative.
I recognize that other than the no-mercy argument, these latter remarks were not objected to and that the Court does not examine improper comments in isolation. "Rather, the Court examines the totality of the errors in the closing argument and determines whether the cumulative effect of the numerous improprieties deprived the defendant of a fair penalty phase hearing." Card v. State, 803 So.2d 613, 622 (Fla.2001) (citing Brooks, 762 So.2d at 899).
Just as in Brooks, the prosecutor's remarks here "were not mere casual innocuous observations," but rather the "record here suggests that the objectionable arguments were tendered calmly and in a fashion calculated to forestall a mercy recommendation." 762 So.2d at 905 (alteration in original) (quoting Pait v. State, 112 So.2d 380, 385 (Fla.1959)). And, in accordance with our holding in Brooks, I find "that the objected-to comments, when viewed in conjunction with the unobjected-to comments, deprived [the defendant] of a fair penalty phase hearing." 762 So.2d at 899 ("Taken individually, in a different case, the prosecutor's comments may not have been so egregious as to warrant reversal. However, the remarks must be viewed cumulatively in light of the record in this case. Here, the improprieties in the prosecutor's closing argument reached the critical mass of fundamental error.") (quoting Cochran v. State, 711 So.2d 1159, 1163 (Fla. 4th DCA 1998)). This Court recognized in Ruiz v. State, 743 So.2d 1, 7 (Fla.1999), and I would likewise hold here, that "[w]hen the properly preserved comments are combined with additional acts of prosecutorial overreaching . . . the integrity of the judicial process has been compromised and the resulting . . . sentence[] irreparably tainted."
Looking at the totality of the circumstances in this resentencing, I conclude that the prosecutor's improper comments compromised the integrity of the penalty phase process and that the jury's recommendation was tainted by the State's improper emotional appeals. As this Court has said more than once, the prosecutor in a death penalty case is charged with an obligation to ensure fundamental fairness in all aspects of the trial. See Brooks, 762 So.2d at 905; Gore, 719 So.2d at 1202. *1072 Here, the prosecutor failed in that obligation.
In addition to the improper closing argument, I agree with Merck's contention that the trial court erred in excluding proffered expert testimony regarding Florida's parole procedures and the likelihood of Merck being paroled. As the majority points out, because of the sentencing law in effect when the crime was committed in 1991, the resentencing jury was instructed that Merck could be sentenced to death or to life in prison without the possibility of parole for twenty-five years. Merck was justifiably concerned that given the possibility of parole after twenty-five years, a sentencing jury in 2004 would unduly consider that he could be paroled only twelve years from the date of their sentencing recommendation if Merck were not sentenced to death. The jury even submitted a question to the court during deliberations as to the penalty, asking: "When the term life in prison without the [possibility] of parole for 25 years is used, when does the time start counting, from this date forward or does his time served count towards the 25 years?" The trial judge responded that he could not answer them directly.
I do not agree that either Jackson v. State, 530 So.2d 269 (Fla.1988), or King v. Dugger, 555 So.2d 355 (Fla.1990), cited by the majority, controls our decision on this issue because Merck's resentencing is not as temporally distant from the day when he will become eligible for parole consideration. As we explained in Hitchcock v. State, 673 So.2d 859, 863 (Fla.1996), the potential for prejudice to the defendant as a result of parole arguments is heightened when resentencing occurs close to the expiration of the twenty-five-year minimum sentence. Accordingly, Merck should have been permitted to offer appropriate expert testimony regarding Florida's parole procedures as they pertain to a defendant who is serving a life sentence without the possibility of parole for twenty-five years. Evidence explaining the parole process would have assisted the jury in making a fair assessment of the appropriate penalty. The expert should not be allowed to opine whether or not Merck will receive parole but neither should the jury receive the misimpression that a defendant who has been convicted of first-degree murder is likely to be paroled after twenty-five years.
Lastly, I would point out that once a particular closing argument has been condemned, this Court should not send mixed signals by once again condemning the argument but affirming the death sentence. As Chief Justice Lewis aptly noted in his special concurring opinion in Brooks:
If the decisions of this Court are to have meaning, particularly in the context of argument in connection with the imposition of capital punishment, we must have uniform application of the standards announced by this Court and not random application which, in my view, leads to confusion and destabilizes the law. I must respectfully but pointedly disagree with the dissenting view that Urbin should not be followed here. I conclude that we must either follow and give meaning to the standards announced in Urbin, or reject its pronouncements and articulate the standard we deem appropriate that should be applied on a uniform basis.
762 So.2d at 906.
Urbin was decided in 1998 but the prosecutor in this sentencing proceeding six years later still made some of the same erroneous arguments expressly condemned in Urbin. Even in Urbin, this Court was constrained to comment that the fact that some of the improper comments present in Urbin were "verbatim *1073 examples of conduct we have unambiguously prohibited in Bertolotti, Garron, and their progeny simply demonstrates that there are some who would ignore our warnings concerning the need for exemplary professional and ethical conduct in the courtroom." Urbin, 714 So.2d at 422. The majority remains "deeply troubled" by this conduct but elects not to reverse because of it. I fear that, despite our best efforts to condemn improper closing arguments and urge prosecutors to refrain from emotional appeal, the majority's affirmance may send a mixed signal to prosecutors.
In his relatively short penalty-phase closing argument, the prosecutor made an improper mercy argument, commented on matters outside the scope of evidence, and suggested that defense counsel manufactured mitigation to deceive the jury, all of which are comments that have been expressly held to be improper. What is worse, all these comments were made with the apparent goal of attempting to inflame the jury's passions toward imposition of the death penalty. For all these reasons, I would reverse and remand for a new penalty phase proceeding.
ANSTEAD and QUINCE, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The Legislature amended section 775.082(1), Florida Statutes, to provide that defendants facing the death penalty pursuant to section 921.141, Florida Statutes, for first-degree murder committed on or after May 25, 1994, shall be punished by death or life imprisonment and shall be ineligible for parole. See § 775.082, Fla. Stat. (1995).
[3] Our decision in Hitchcock v. State, 673 So.2d 859, 863 (Fla.1996), which found that the potential for prejudice to the defendant as a result of parole arguments is heightened when resentencing occurs close to the expiration of the twenty-five-year sentence is distinguishable. In the instant case, the State did not argue that Merck would be considered for parole after serving twenty-five years.

Merck's appeal does raise a pertinent issue as to whether the portion of the standard jury instruction applicable to first-degree murders committed before May 25, 1994, that informs jurors that a life sentence is "without the possibility of parole for twenty-five years" is necessary. We will refer the question of whether the standard jury instruction should be amended to the Criminal Court Steering Committee.
[4] The trial judge initially denied Merck's motion in limine regarding the foregoing evidence because he found that the prior trial judge's denial of the same motion during the first resentencing became the "law of the case" after it was upheld on appeal by this Court. This law-of-the-case reasoning was erroneous. First, in Merck's appeal from his first resentencing, this Court declined to reach Merck's claim that the trial court erred in excluding evidence regarding another suspect because the Court found reversible error on another ground. Merck II, 763 So.2d at 297. Second, this Court has consistently applied the "clean slate" rule to resentencing proceedings. Preston v. State, 607 So.2d 404, 408 (Fla.1992). A resentencing is to proceed in every respect as an entirely new proceeding. A trial judge is to properly apply the law during the new penalty phase and is not bound in proceedings after remand by a prior legal error. Id. at 409 (citing Spaziano v. State, 433 So.2d 508, 511 (Fla.1983), aff'd, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984)). However, the evidence was either admitted or not proffered, and therefore the trial court's erroneous law-of-the-case ruling was harmless error.
[5] Merck's argument on appeal does identify numerous factual misstatements in the trial court's sentencing order concerning mitigating circumstances. Factual errors in a sentencing order are subject to harmless error analysis. See Lawrence v. State, 846 So.2d 440, 450 (Fla.2003); Hartley v. State, 686 So.2d 1316, 1323 (Fla.1996). As stated above, we find that the trial judge's mitigation findings and assignments of weight are supported by the record. Thus, the factual errors are harmless.
[6] The importance of the jury's ability to consider all properly submitted, relevant mitigation cannot be underestimated. See, e.g., Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (holding that the sentencing judge or jury may not be precluded from considering any evidence regarding a mitigating circumstance that is proffered by a defendant in order to receive a sentence less than death); see also Hitchcock v. Dugger, 481 U.S. 393, 399, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (same).