# Third District Court of Appeal

## State of Florida

Opinion filed August 9, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-2270
Lower Tribunal No. 13-10249
_____

**Charles Kyle Williams,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Bronwyn C. Miller, Judge.

Eugene F. Zenobi, Criminal Conflict and Civil Regional Counsel, Third Region, and Philip L. Reizenstein, Assistant Regional Counsel, for appellant.

Pamela Jo Bondi, Attorney General, and Linda S. Katz, Assistant Attorney General, for appellee.

Before LAGOA, SCALES and LUCK, JJ.

LUCK, J.

Charles Kyle Williams appeals his aggravated battery conviction and sentence, following a jury trial, because (1) of improper statements made by the

state during closing argument and (2) the trial court's sentence was unconstitutionally vindictive. After review of the record and briefs, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On March 18, 2013, Michelle Emmanuel (a student at Miami-Dade College) went to the college computer lab to visit her boyfriend, Williams, who was a Miami-Dade College employee working in the lab. The couple discussed a fight which had occurred several days before when Emmanuel discovered pictures of another woman on Williams' phone. After hours talking and sitting in the lab, Williams suggested that they go to the next room, a "testing area." The computer lab and testing area were separated by a sliding partition and "steal door."

Upon entering the room, Emmanuel sat in the "far corner of the testing room" and Williams proceeded to go through her cellular telephone. Williams "got mad" when he found a text message conversation between Emmanuel and her "good friend" Richard Pearson. Williams directed Emmanuel to call Pearson and the two men spoke on the telephone. After hanging up with Pearson, Williams told Emmanuel that she disrespected him and punched her on the eye "repeatedly." He also hit her on the mouth twice with an open palm, busting her lip. He then spit on her.

After the attack, Williams gave Emmanuel a napkin for her bloody lip and opened a separate door so that she would not have to walk through the computer lab. Only a few people were working in the lab during the altercation. Emmanuel went to the bathroom to clean up and was eventually picked up by Pearson who took her to the college's public safety office to report the attack.

Prior to voir dire, the following exchange occurred between Williams and the trial court:

> Court: The State has indicated that if you are convicted in this case, the minimum that the Court can give you, absent statutory mitigating circumstances is 44.7 months in state prison.
>
> The maximum, of course, as charged is fifteen years in state prison absent any announcement the State filed prior to sentence, do you understand that?
>
> Williams: Yes.
>
> Court: Is there any offer in this case?
>
> Assistant State Attorney: I'll offer him seven years state prison absent hearing defense counter.
>
> Court: They are offering you seven years in state prison at this time, are you interested in that offer?
>
> Williams: No, ma'am.
>
> Court: Do you need any additional time to speak with the attorney regarding any negotiations in this case?
>
> Williams: No, ma'am.
>
> Court: All right. Very good.

After rejecting the state's plea offer, Williams proceeded to trial.

At trial, three state witnesses testified to either seeing Emmanuel in the lab the day of the beating or seeing a young woman with a bloodied rag over her face leave the building around the time of the attack. The witnesses present in the lab at the time testified they did not hear screaming coming from the testing area.

The defense's theory of the case was that the parties were not dating (as Williams was married), and that, in fact, Williams defended Emmanuel from an attack by Pearson which took place across the street from the college at the Walgreens parking lot. In support of its theory, the defense presented two witnesses: Brenda Pearsall and Stanley Collins, an engaged couple, who testified to an altercation in the Walgreens parking lot across the street from the college on March 18. They both testified that Williams told an unidentified-man not to hit the woman. Pearsall admitted that she was a five time convicted felon; and Collins admitted that he had been convicted of twelve prior felonies. On cross examination, the couple also testified that, months after the battery took place, Williams' wife contacted Collins about testifying in the case.

Following closing arguments, defense counsel moved for a mistrial "based on [the] [s]tate's rebuttal, based on multiple instance[s of denigration] of [the] defense, based on statement of the law with regards to burden of proof. Multiple

4

instances of burden shifting." The motion was denied. The jury returned a verdict of guilty as charged for aggravated battery.

The trial court subsequently held a sentencing hearing. During the hearing, Williams stipulated that he had been convicted of two prior felonies: one from Texas for aggravated robbery with a firearm; and one from Broward County for possession of a weapon (a dagger) by a convicted felon. He also stipulated to one prior misdemeanor conviction for driving without a valid driver's license. Emmanuel was present at sentencing and the state read a statement from her detailing the continuing physical and emotional effects of the attack.

The state asked the trial court to sentence Williams to the fifteen year statutory maximum because of Williams' prior convictions which involved the use of weapons (firearm and knife), and the victim's testimony regarding her injuries. After commenting on the evidence presented at the hearing, the trial court sentenced Williams to thirteen years' imprisonment, followed by one year of community control and one year of probation.

## STANDARD OF REVIEW

"A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion. We look at the closing argument as a whole to determine whether that discretion was abused." Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007) (citation omitted). "Where

5

counsel failed to raise a contemporaneous objection when improper closing argument comments were made, the unobjected-to comments must rise to the level of fundamental error, which has been defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Evans v. State, 177 So. 3d 1219, 1234 (Fla. 2015) (quotation omitted). On the other hand, "[t]he issue of whether a defendant's sentence is vindictive is a question of law subject to de novo review." Simplice v. State, 134 So. 3d 555, 556 (Fla. 5th DCA 2014); see also Vardaman v. State, 63 So. 3d 925, 926 (Fla. 4th DCA 2011) ("Whether a defendant's sentence is vindictive is a question of law subject to de novo review."); Baxter v. State, 127 So. 3d 726, 734 (Fla. 1st DCA 2013) ("Our analysis of whether a defendant's sentence is the product of judicial vindictiveness involves a question of law subject to de novo review.").

**DISCUSSION**

Williams, on appeal, challenges more than twenty statements made by the state during its first and second closing arguments, and contends that his sentence was unconstitutionally vindictive. We address each of these arguments below.

1. Improper Comments During Closing Argument

Williams claims the state made approximately twenty improper comments during its two closing arguments. For the vast majority of these alleged errors,

6

Williams did not raise a contemporaneous objection, and they were not errors at all. For example, in its rebuttal closing, the state argued: "The defendant savagely, maliciously, and intentionally beat [Emmanuel] causing great bodily injury in this case." This was a reasonable inference from the evidence, and a fair reply to Williams' argument in his closing that:

> The State wants to charge that Mr. Williams intentionally caused great bodily harm by striking Miss Emmanuel with a closed fist. That's not intentionally causing great bodily harm unarmed. Hitting someone three times that's not intentional. That's felony battery at best.

See Watson v. State, 50 So. 3d 685, 686 (Fla. 3d DCA 2010) ("[A] proper rebuttal argument is limited to a reply to what has been brought out in the defendant's closing argument.").

As part of its burden to prove that Williams committed aggravated battery on Emmanuel, the state had to show that Williams "[i]ntentionally or knowingly cause[d] great bodily harm, permanent disability, or permanent disfigurement." § 784.045(1)(a)1., Fla. Stat. (2013). Given that Williams' defense, in part, was that his beating of Emmanuel did not intentionally cause her great bodily harm, the state was entitled to argue, using synonyms of "intentional" and "great bodily harm," that the state met its burden to prove this essential element of the crime.

The evidence, moreover, supported the inference that the beating was savage, malicious, and intentional. Emmanuel testified that after getting off the telephone with Emmanuel's friend, Pearson, Williams told Emmanuel that she

7

disrespected him and then punched her repeatedly on the eye, hit her on the mouth twice, busted her lip open, and spat on her.  Emmanuel was bleeding as she fled the computer lab, and the next day, because it hurt to even open her eye, she had to go to the hospital.  Emmanuel ultimately was diagnosed with a fractured left eye.  The jury saw pictures of Emmanuel's beaten face.  Because Williams' intent was a jury question, State v. Gee, 624 So. 2d 284, 285 (Fla. 2d DCA 1993) ("[I]ntent is generally a jury question that in most instances cannot be ascertained by direct evidence but only inferred . . . ."), and he put intent at issue in his closing argument, there was a reasonable inference to be made that beating a woman until she's bleeding, her lip is busted, her eye cannot open, she has to go to the hospital, breaking her eye socket, and spitting on her, all because she disrespected Williams, was savage and malicious.

Williams also contends that it was improper for the state to argue in its rebuttal closing that:

> [Emmanuel] didn't cry out. She didn't yell out for help.  She was victimized by this thirty-eight year old defendant at the time who was romantically involved with a twenty year old little girl. . . . The victim in this case didn't cry loud.  She didn't scream out.
> She was a mouse on that witness stand.  I submit to you members of the jury she was a mouse on that day.  She couldn't cry out.  She couldn't scream for help.  She was paralyzed with fear.
> When she cried, she cried softly and took it.

This, too, was a reasonable inference from the evidence, and a fair reply to Williams' argument that the beating did not happen in the computer lab as

8

Emmanuel testified because no one heard her scream. Williams argued in closing that:

> The State would have you believe that while this brutal attack took place, which Miss Emmanuel was crying out to the point that Mr. Williams was allegedly hitting her more for how loud she was being that no one in that room heard it.
> The fact that Miss Moore and Miss Holliman [two witnesses] were there and heard nothing is reasonable doubt.

The evidence supported the inference that Emmanuel was a quiet person. The two witnesses in the computer lab testified that she was. Emmanuel came off that way on the witness stand. See Parker v. State, 641 So. 2d 483, 485 (Fla. 5th DCA 1994) (where a witness takes the stand, "he subject[s] himself, as does every witness, to opposing counsel's comments regarding his credibility and demeanor as a witness."); Fla. Stnd. Jury Instr. (Crim.) 3.9 (the standard criminal jury instruction on credibility states that the jury should "consider how the witnesses acted, as well as what they said"). Emmanuel testified that her focus, after being hit, was on "just leaving and getting away." And Detective Harris testified that domestic violence victims are sometimes reluctant to come forward. The purpose for describing Emmanuel as a mouse was not to evoke sympathy for her, as Williams claims on appeal, but rather to rebut Williams' argument that no one heard her scream. This was a fair explanation in response to the defense's closing argument that others in the computer lab did not hear Emmanuel being beaten.

9

Williams contends the state denigrated the defense when it said the defense witnesses' testimony was "out of thin air," and "[b]y the way between the two of [them] we have got seventeen felony convictions." These statements were reasonable inferences from the evidence, and a fair reply to Williams' closing argument. Williams' defense, in part, was that he did not beat Emmanuel in the computer lab, but that Pearson beat Emmanuel at the Walgreens parking lot across the street and Williams tried to stop it. Williams argued in his closing:

> You can believe [the defense witnesses'] testimony, not only because it is consistent with each other. Not only because these two people have no reason to lie about this. They have no stake in this, but because they were honest with you.

It was a fair reply for the state to respond that the defense witnesses had a reason to lie about their testimony, and were not being honest with the jury. The defense witnesses' testimony was contradicted by others who saw Emmanuel together with Williams at the computer lab (and had seen them together in the past), and saw Emmanuel run from the computer lab with a bloody napkin in front of her face. The defense witnesses, moreover, were solicited to testify by Williams' wife, and only came forward at her prompting. Ms. Pearsall admitted she was a five time convicted felon, and Mr. Collins testified he was a twelve time convicted felon. See Fla. Stnd. J. Instr. (Crim.) 3.9 ("You should consider how the witnesses acted, as well as what they said. Some things you should consider are . . . Has the witness been convicted of a felony . . . .").

It is not burden shifting for the state to comment on the lack of evidence supporting a defense theory where the defendant puts on a case and argues that a third person committed the crime. The "out of thin air" and "seventeen felony convictions" comments, in context, were a fair reply by the state to the credibility of the defense witnesses and the lack of evidence supporting the Walgreens' defense theory. See Concepcion v. State, 188 So. 3d 5, 9 (Fla. 3d DCA 2016) ("The record, however, demonstrates that the State's arguments were responsive, and were directed to the evidence, and were not personal attacks of defense counsel or improper denigration of the defendant's theory of defense. The State merely argued that the case was about a child who had been victimized by the defendant, and that the evidence did not suggest that the mother had concocted a story or that VDR was lying about what happened that day. These arguments were fair responses to defense counsel's closing arguments and were based on the evidence introduced at trial.").

And so on. None of the alleged errors, separately or together, was an abuse of discretion (for preserved errors) or fundamental error (for the unpreserved ones) that reached down into the validity of the trial itself such that a guilty verdict could not have been obtained without the assistance of the alleged error. For the unpreserved errors, the evidence of Williams' guilt was strong. The jury had Emmanuel's testimony with pictures of her injuries. Two independent witnesses

11

saw Emmanuel in the computer lab around the time of the attack. And a third independent witness saw a woman with a bloody rag on her face leaving the computer lab building. The unpreserved errors alleged by Williams did not reach down to the validity of this evidence supporting that Emmanuel was beaten at the computer lab, where Williams worked, and not at the Walgreens across the street.

2. Vindictive Sentence

Williams contends that his thirteen year sentence should be reversed because it was unconstitutionally vindictive.

> [W]hen a claim of vindictive sentencing is raised, the reviewing court must examine all of the surrounding circumstances of a rejected plea and the sentence imposed to determine whether they create a presumption of vindictiveness. If the totality of the circumstances give rise to a presumption of vindictiveness, then the burden shifts to the State to produce evidence to dispel the presumption. However, if the totality of the circumstances do not give rise to a presumption of vindictiveness, the burden never shifts to the State and the defendant must satisfy his burden to prove actual vindictiveness.

Concepcion, 188 So. 3d at 9 (citations omitted). In determining whether the totality of the circumstances give rise to a presumption of vindictiveness, we begin by applying the Wilson v. State, 845 So. 2d 142 (Fla. 2003) factors:

> (1) Whether the trial judge initiated the plea discussions with the defendant . . . .;
> (2) Whether the trial judge, through his or her comments on the record, appears to have departed from his or her role as an impartial arbiter by either urging the defendant to accept a plea, or by implying or stating that the sentence imposed would hinge on future procedural choices, such as exercising the right to trial;

12

(3) The disparity between the plea offer and the ultimate sentence imposed; and

(4) The lack of any facts on the record that explain the reason for the increased sentence other than that the defendant exercised his or her right to a trial or hearing.

Concepcion, 188 So. 3d at 9-10 (quotation omitted).

    *a.*   *Initiating plea discussions.*   The trial court did not initiate plea discussions with Williams. Before jury selection, the trial court went over the sentencing guidelines and maximum penalties with Williams, and asked if there were any outstanding plea offers in the case. Once the state indicated that it had a plea offer, the trial court asked if Williams wished to accept the offer and whether he needed more time to discuss it with his attorney.

    There is no presumption of vindictiveness from the trial court's pre-trial colloquy with the defendant. See Floyd v. State, 198 So. 3d 718 (Fla. 2d DCA 2016) (stating it was not a violation of Warner for judge to ask if defendant was aware of state's plea offer, explain the state's offer, and inform defendant of his sentencing exposure as long as it is done impartially and not while advocating for the state offer); Hornbuckle v. State, 864 So. 2d 1203, 1205 (Fla. 4th DCA 2004) (finding no vindictiveness where "[t]he only discussion involving the plea centered around whether Mr. Hornbuckle wanted to accept the State's offer, or plead open to the court"); Vondervor v. State, 847 So. 2d 610, 614 (Fla. 5th DCA 2003) ("Prior to trial, a judge may ask the attorneys if a plea offer has been extended, and

13

may ask the defendant if he is aware of a pending plea offer without violating Warner's restrictions. The judge can even tell the defendant at the same time of his or her maximum exposure if convicted at trial." (citation omitted)). Indeed, the experienced trial court did what we would commend all trial courts do prior to jury selection: ask the parties whether any plea offers had been extended; ensure the offers have been communicated to the defendant by counsel; confirm the defendant is aware of the maximum and minimum penalties and the sentencing guidelines; and inquire whether the defendant is rejecting the plea offer. See Rosado v. State, 129 So. 3d 1104, 1109 (Fla. 5th DCA 2013) ("[A] presumption of vindictiveness does not arise because the trial judge neither initiated the plea discussions nor departed from her role of neutrality. Rather, as most experienced trial judges do, prior to jury selection, she inquired of the parties as to whether any plea offers had been tendered and ensured that they had been communicated to Rosado. The judge further inquired whether Rosado had rejected that offer and was aware of the potential maximum sentence.").

Defendants have a constitutional right to be advised of plea offers and to have the effective assistance of counsel in deciding whether to accept or reject them. See Missouri v. Frye, 566 U.S. 133, 145 (2012) ("[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."); Lafler v. Cooper, 566 U.S.

14

156, 162 (2012) ("Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process. During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" (citations omitted)). For this reason, it is wise and appropriate for the trial courts to ensure that defendants' plea-offer rights are being protected, in the same way that trial judges make sure defendants are knowingly, voluntarily, and intelligently accepting a plea. See Fla. R. Crim. P. 3.170(k) ("No plea of guilty or nolo contender shall be accepted by a court without the court first determining . . . that the circumstances sounding the plea reflect a full understanding of the significance of the plea and its voluntariness and that there is a factual basis for the plea of guilty."). Just as trial courts have a standard plea colloquy with defendants before entering a guilty plea, so too should trial courts colloquy a defendant before trial about knowingly, voluntarily, and intelligently rejecting a plea offer. Doing so is not initiating plea discussions, and is not vindictive.

b. *Comments on the record.* The trial court did not urge Williams to accept the plea. And the trial court did not state or imply that Williams' sentence would hinge on whether he exercised his right to trial. The trial court asked Williams if he wished to accept the offer and if he needed more time with his trial counsel. Once Williams said he was rejecting the plea offer, the trial court said, "All right. Very good," and then proceeded to trial. Without more, there can be no

15

presumption of vindictiveness.  See Concepcion, 188 So. 3d at 10 (finding no presumption of vindictiveness where "[t]he trial court did not recommend or urge the defendant to accept the State's plea offer or imply that upon a conviction, the defendant's sentence would be increased because he exercised his right to a trial").

    *c.  Disparity.*  The disparity referred to in the third Wilson factor is the disparity between the trial court's plea offer to resolve the case, and after defendant rejects the court-extended offer, the trial court's ultimate post-trial sentence.  See Wilson, 845 So. 2d at 158 ("Turning to Wilson, this case involves a violation of probation where the trial judge offered to sentence Wilson to 128 months if he pled guilty. . . .  This implication is heightened by the fact that immediately after the hearing, which was held shortly after the plea discussions, the judge imposed a 150-month sentence without explanation." (citation omitted)); id. at 157-58 ("[T]he trial judge exceeded the limits of Warner by both urging Byrd to accept the plea offer of thirty years and stating that if Byrd chose to go to trial he 'certainly' would not get that low. . . .  Further, there is an extremely large disparity between the offered thirty-year sentence and the seventy-five year sentence imposed." (citation omitted)).  Here, because the trial court did not make a plea offer to Williams, there was no disparity.  The trial court did not indicate any preference before the trial began, or urge the defendant to accept a particular plea, to compare to the ultimate sentence.

*d. Explanation for the sentence.* The trial court explained that its sentence was based on the jury's verdict, the statements from members of the community, including Emmanuel, and Williams' "very serious prior criminal history," including the facts of his prior cases from Texas and Broward County. The Florida Supreme Court cited these same factors as ones that could justify an increased sentence from the one offered by the trial court pre-trial but rejected by the defendant. Id. at 157 (quoting Prado v. State, 816 So. 2d 1155, 1164 (Fla. 3d DCA 2002) (Sorondo, J., concurring)) ("Factors such as the nature of the defendant's prior convictions, the degree of violence employed by the defendant during the commission of the crime, the sophistication with which the charged offense was committed, and/or the physical or psychological suffering endured by the victim(s), are some factors that might lead the court to increase what it originally considered to be an acceptable sentence."). The trial court, here, gave a detailed explanation for her sentence based on objective factors that it did not have at the time of its pre-trial plea colloquy.

In sum, none of the Wilson factors indicate a presumption of vindictiveness. "[W]here," as here, "the trial court merely confirms that the defendant understands the terms of the plea offer and the potential sentences he is facing, there exists no presumption of vindictiveness." Concepcion, 188 So. 3d at 10. Likewise, "[t]he disparity between the State's pre-trial plea offer and the sentence imposed by the

17

trial court after trial, standing alone, does not create a presumption of vindictiveness nor require resentencing." Id. Here, as in Concepcion, other than the fact the trial court's sentence was higher than the state's pretrial plea offer, Williams has presented no evidence that the sentence was vindictive. Even as to this fact, however, there is nothing in the record to indicate the trial court would have accepted, or urged the defendant to accept, the state's seven-year plea offer. There is nothing in the record to indicate the trial court penalized Williams for exercising his right to go to trial. And the trial court explained the reasons for its sentence, which included information it did not have at the time of the pre-trial plea colloquy: the details of Williams' prior criminal history; the remarks made at the sentencing hearing, including Emmanuel's statement of the emotional and physical impacts the beating had on her; and facts of the case supporting the jury's verdict, including the extent of Emmanuel's injuries. These facts, even where the trial court makes a plea offer and the presumption of vindictiveness arises, may support an increased sentence. Without the presumption of vindictiveness, it is not enough for Williams to meet his burden to show the trial court's sentence was actually vindictive.

## CONCLUSION

For these reasons, Williams' conviction and sentence for aggravated battery are affirmed.

18

Affirmed.