# Supreme Court of Florida

————————

No. SC12-2160

————————

**PATRICK ALBERT EVANS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 12, 2015]
**<u>CORRECTED OPINION</u>**

PER CURIAM.

Patrick Albert Evans appeals his two convictions for first-degree murder and two sentences of death.[1] Because of errors that occurred during the trial, we vacate the convictions and sentences of death and remand for a new trial.

Among other errors, the lead detective usurped the role of the jury by being permitted to opine that a voice heard on a 911 call-back recording belonged to the defendant, even though the detective had no prior knowledge of the defendant and

---

1. We have jurisdiction of Evans' appeal under article V, section 3(b)(1), of the Florida Constitution.

no expertise in voice identification.  In addition, the State insinuated unsubstantiated and incriminating facts when it cross-examined the defendant, by implying through its questions that the defendant was obsessed with his estranged wife and stalking her boyfriend—the victims.  Yet, the prosecutor recognized that he could not present any evidence to support such statements because they were based on speculation and hearsay.  The prejudicial effect of these errors was then amplified by patently improper comments in the closing argument, during which the prosecutor repeatedly disparaged the defendant's theory of the case and defense attorneys in general; relied on facts and statistics not in evidence to imply that the victims must have been murdered by a family member; and criticized the defendant's decision to pursue his constitutional right to a jury.

The cumulative effect of these preserved errors was not harmless beyond a reasonable doubt, and the existence of additional unpreserved errors buttresses our conclusion that Evans is entitled to a new trial.  Accordingly, for the reasons more fully explained in this opinion, we vacate Evans' convictions for first-degree murder, vacate the sentences of death, and remand for a new trial.

## FACTS

On January 22, 2009, Evans was indicted for the first-degree murders of Elizabeth Evans ("Beth"), his estranged wife, and Gerald Taylor, Beth's new

boyfriend. The two were fatally shot in the master bedroom of Beth's condominium on December 20, 2008.

The record reflects that Evans and Beth had a tumultuous marriage. While married to Beth, Evans had an affair with his ex-wife, Andrea, the mother of his minor son. Evans ended the affair in April 2008, but then filed a petition to divorce Beth, stating that the marriage was irretrievably broken. Shortly thereafter, Evans changed the locks on the marital home and, without Beth's knowledge, moved the belongings of Beth and her daughter from a prior marriage, Molly, to a condominium that Evans and Beth owned. However, approximately one week later, again without Beth's or Molly's knowledge, Evans returned their belongings to the marital home. Soon after, Beth independently and individually leased a condominium, but was unable to collect her furniture from the marital home so she purchased new furniture. In addition to bedrooms for her and Molly, Beth set up a third bedroom at the condominium for her stepson because, despite the pending dissolution of marriage, she wanted to maintain a relationship with him. Her stepson occasionally visited Beth at the condominium, and Evans would drop him off and pick him up.

In July 2008, Evans attempted to rekindle his relationship with Beth and voluntarily dismissed the petition for dissolution of marriage that he had filed only a few months prior. According to Molly, Evans began to wear his wedding ring.

He also made an effort to visit the condominium, and when the door was unlocked, Evans would simply enter without knocking or announcing himself. Molly stated that Beth did not appreciate Evans' efforts to rekindle the relationship, and she became upset when he entered her condominium unannounced. Beth never gave Evans a key to her condominium. However, during the fall of 2008, Beth discovered that the keys to her condominium were missing. She eventually retrieved the keys from Evans' mother, Marcy. In November 2008, Beth filed a petition for dissolution of marriage, which Evans testified did not upset him.

Evans testified that he was aware Beth had a date on December 20, 2008— the day of the murders—but claimed he did not know her date's name. During the late afternoon of December 20, 2008, Molly's boyfriend saw Beth with a man, whom Beth introduced as Jerry, hitting golf balls at the course where Molly's boyfriend worked. Beth and her companion left the course around 5:30 p.m. At approximately 6:15 p.m., Beth's next-door neighbor, Pamela Ashby, who had dinner plans, became nervous because the person who was to pick up a child in Ashby's care was running late. Ashby intended to call Beth to see if the child could stand in Beth's driveway until the person arrived, but she accidentally dialed Evans' number. Evans informed Ashby that Beth was not available because she was on a date.

At approximately 6:45 p.m., Scott Graham, who also lived in the same condominium complex as Beth, was walking his dog. A man approached Graham and asked if he had seen two Yorkshire Terriers, to which Graham replied that he had not. The man departed in the direction of Beth's condominium. The only person in this fifteen-unit complex that Graham knew to have Yorkshire Terriers was Beth Evans. He testified that, while the man who approached him that night definitely resembled Evans, Graham could not definitively identify him.

At 7:09 p.m., the 911 dispatch service received a hang-up call from the landline at Beth's condominium. When a public safety telecommunicator called the number, the following was recorded:

Male Voice #1: Sit on the bed.

Female Voice: I'm going to put a robe on.

Male Voice #1: No, you're not put—[inaudible]

Dispatcher: Hello?

Male Voice #1: Sit on the bed.

Female Voice: No.

Dispatcher: Hello?

Female Voice: Rick—[simultaneously with]

Male Voice #1: Sit on the bed.

Female Voice: No! Rick![2]

---

2. Evans testified during the trial that his nickname is Rick.

Male Voice #2:  Put the gun down and I'll sit down, all right?

Male Voice #1:  Sit on the bed.  Sit on the bed, Jerry.

Male Voice #2:  I'll sit down once you put the gun down.  Hey, hey. [inaudible] . . . gun down.

Male Voice #1:  Jerry, sit on the bed.

Female Voice:  Help!

Male Voice #2:  Please.

Female Voice:  Help! [more distance than the initial call for help]

Male Voice #2:  Put the gun—[gunshot]

Female Voice:  Are you out of your fuck—[gunshot]

Dispatcher:  Hello?

No further voices were heard until law enforcement arrived.

The two deputies who responded to the 911 hang-up call discovered that the door to Beth's condominium was unlocked, and there was no sign of forced entry. Once they entered the home, they saw one Yorkshire Terrier.  After determining that no one was present on the lower level of the home, the deputies proceeded upstairs.  The deputies found Gerald Taylor on the floor of the master bedroom, nude, with a small wound in his neck.  Taylor was alive but nonresponsive and subsequently died.  The deputies discovered the body of Beth Evans, also nude and with a wound in her neck, on the screened-in patio that was attached to the master bedroom.  Sitting next to her body, shaking, was a second Yorkshire Terrier.  Two .40 caliber shell casings were discovered at the scene—one in the vicinity of where

each victim lay. On a nightstand in the master bedroom was an Uncle Mike's Sidekick holster.

Upon learning that Evans was Beth's next of kin (the dissolution of marriage was not yet final), the lead detective, Edward Judy, proceeded to Evans' home at approximately 11:15 p.m. At that point, Detective Judy had not heard the 911 call-back recording. Although Evans' truck was present, he did not answer the door when Detective Judy attempted to make contact. Detective Judy placed his card in the door of Evans' home and departed. Detective Judy subsequently heard the recording during which Beth referred to the shooter as "Rick."

Evans was taken into custody by a tactical team that had been conducting surveillance on his residence. Thereafter, a warrant was issued to search the home for a handgun and ammunition. Inside a safe at the residence were three boxes of Speer Gold Dot .40 caliber hollow-point ammunition, the same brand of ammunition as the casings found at the scene of the murders. Two of the boxes had bullets removed. Also inside the safe was a factory box for a .40 caliber Glock firearm, but no gun was found. The police were able to match the serial number on the box with the serial number of the gun that Evans purchased on November 22, 2005, from a sporting goods store. The holster recovered from the crime scene appeared to match a holster Evans purchased at the same time.

Inside the Glock factory box was an envelope that contained two shell casings from test firings that had been conducted at the factory. The serial number on the envelope matched the serial number on the box and the receipt from the sporting goods store. A firearms analyst with the Florida Department of Law Enforcement testified that the shell casings found at the crime scene matched the test-fired shell casings from the Glock factory.

During trial, Beth's daughter Molly, Ashby (Beth's neighbor), and Detective Judy all identified Evans as the male voice on the 911 call-back recording saying, "Sit on the bed."[3] The medical examiner testified that Beth Evans and Gerald Taylor died from gunshot wounds to the neck, and the cause of death was homicide. Stippling was present around Taylor's entrance wound, which indicated that the muzzle was 2 to 24 inches away at the time the weapon was discharged. No evidence of stippling was present on Beth's body. The handgun that was used to commit the murders was never found.

During the defense case-in-chief, Evans and his brother, Rodney, testified that from approximately 4:15 p.m. until 8:20 p.m. on the day of the murders, they were together fishing, cooking, shooting pool, and packing for a ski trip that Evans

---

3. Detective Judy testified that his familiarity with Evans' voice arose from a review of recordings of phone conversations between Evans and family members while Evans was held at the Pinellas County Jail.

had planned. Evans denied that it was his voice on the recording. He spoke the following phrases in front of the jury after segments from the recording were played: "Sit on the bed," "Sit on the bed, Jerry," and "Jerry, sit on the bed."

In addition to presenting an alibi defense, the defense implied that Evans' ex-wife, Andrea, could have been responsible for the murders. Evans testified that during his marriage to Beth, there was constant tension between Andrea and Beth. He described the close relationship between Beth and his son and noted that the child called Beth "mom" and Andrea "mommy." Evans also noted that during a burglary of his home in February 2008, a bracelet that his son had given to Beth, which said "Mom," had been taken. Evans testified that Andrea knew the code to the safe in which the firearms were kept and that Andrea had been visiting Beth's condominium.[4] Evans noted that Andrea was in dire financial straits, and shortly after the murders, she filed a Motion to Enforce Child Support. He further explained that in January 2009, he was scheduled to get a large payout from his former employer, and Andrea subsequently sought an enforcement of equitable distribution. During guilt-phase closing arguments, defense counsel asserted that

---

4. Molly testified that despite the initial problems that Evans and Beth encountered with Andrea, and despite the affair between Andrea and Evans, Andrea and Beth eventually became friends. According to Molly, Andrea would visit Beth and bring the child along. Molly also testified that Andrea knew Beth and Taylor were going to be together on the weekend of the murders.

Andrea was the only person who stood to gain financially from the murder of Beth. The jury found Evans guilty of the first-degree murders of Elizabeth Evans and Gerald Taylor.

During the penalty phase, the State did not present additional evidence. Evans presented his mother, Marcy, and his two brothers, Rodney and Glenn, who testified that Evans is a dedicated family man and a good son and brother. Rodney described how Evans helped him through addiction and mental health issues. He testified about Evans' charitable work with Smile Corporation and how Evans provided scholarships to high school students and donated buses to organizations and churches.[5] Rodney also described Evans' love for his son. Marcy described Evans as a hard worker who accepted and met his responsibilities. She also recounted how he provided her with emotional support when her brother died and her house burned down.

The jury recommended sentences of death by a vote of nine to three for the murder of Beth and by a vote of eight to four for the murder of Taylor. During the Spencer[6] hearing, no additional evidence was offered by Evans. Defense counsel

---

5. During penalty-phase closing statements, defense counsel also referenced Evans' charitable work with the Boys & Girls Club. Molly mentioned this work during her guilt-phase testimony.

6. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

informed the trial court that "there was a doctor who was hired in regards to this matter who has done an evaluation in regards to Mr. Evans. However, there is nothing . . . that would indicate that there was any evidence of mental mitigation for which the Court could consider in this matter."

The trial court sentenced Evans to death for the murders of Beth and Taylor. The trial court found that two aggravating circumstances had been established: (1) Evans had been convicted of a prior capital felony (the contemporaneous murder of the other victim) (great weight); and (2) the murders occurred while Evans was engaged in the commission of or an attempt to commit a burglary (great weight). The trial court concluded that Evans had established the statutory mitigating circumstance that he had no significant criminal history and gave this factor "some weight." However, the trial court rejected the statutory mitigating factor of Evans' age at the time of the crimes (41 years old). The trial court found six nonstatutory mitigating circumstances: (1) Evans' work ethic and history (moderate weight); (2) Evans' relationship with his children—his son with Andrea and a daughter from his first marriage (little weight); (3) Evans shares love and support with his family (little weight); (4) Evans has behaved appropriately during courtroom proceedings (minimal weight); (5) the length of his mandatory sentence (little weight); and (6) Evans' charitable and humanitarian deeds (little weight). The trial court concluded

that the aggravating factors outweighed the mitigating factors. This direct appeal

follows.

## ANALYSIS

On direct appeal, Evans raises eight issues: (1) whether the trial court erred

when it denied Evans' motion for judgment of acquittal on the charge of

premeditated first-degree murder; (2) whether the trial court erred when it

instructed the jury on burglary as the underlying felony as a basis for first-degree

felony murder; (3) whether the trial court erred when it allowed Detective Judy to

offer an opinion that the voice on the 911 call-back recording was that of Evans;

(4) whether the trial court erred when it denied Evans' motion for a mistrial and

declined to give a curative instruction after the State insinuated that Evans hired a

private investigator to investigate Gerald Taylor; (5) whether during guilt-phase

closing arguments, the prosecutor denigrated Evans and his defense, improperly

commented on Evans' right to a jury trial, and misstated the law; (6) whether

Evans is entitled to a new trial based on cumulative error during the guilt phase; (7)

whether the trial court improperly minimized the mitigation evidence; and (8)

whether the death sentences are disproportionate.

For the reasons that follow, we reject Evans' claims that the trial court erred

in denying a judgment of acquittal and in instructing the jury on burglary as the

underlying felony. However, we conclude that numerous errors occurred during

the trial, including that the trial court erred in permitting a law enforcement officer to testify to voice identification simply because he listened to jailhouse recordings of Evans on multiple occasions (Issue 3); the State insinuated through unsupported questioning that Evans hired a private investigator to investigate Taylor (Issue 4); and the prosecutor gave improper closing arguments (Issue 5). We hold that, based on these cumulative errors, Evans is entitled to a new trial. We do not address the penalty-phase issues because we vacate the convictions and sentences of death.

## I. Voice Identification by Law Enforcement Officer

In the first issue we address, Evans claims that the trial court erred when it permitted Detective Judy to offer his opinion that the voice on the 911 call-back recording belonged to Evans. During trial, the prosecutor asked Detective Judy if he could recognize Evans' voice based upon the fact that he had listened to jail recordings between Evans and family members, and Detective Judy replied, "Absolutely." Defense counsel objected, contending that it was inappropriate to permit Detective Judy—the lead detective—to testify to such matters. Counsel also asserted that to permit Detective Judy to offer an opinion would invade the province of the jury because he was not a family member or close friend who had spoken with Evans in the past. The trial court overruled the objection, stating:

> The comparison, apparently, is a known voice exemplar from a jail call and he's heard the unknown voice [from the call-back recording]. And the jury can do that. There is no reason why this detective can't

- 13 -

do that and recognize it's his own opinion. [The State is] not qualifying him as some sort of expert with voice waves and all that.

The trial court also stated that a voice identification by Detective Judy would not be prejudicial because identifications of Evans as the voice on the call-back recording had been made by Beth's daughter Molly and Beth's neighbor Ashby. Thereafter, Detective Judy testified that he had listened to the call-back recording over fifty times, and there was no question in his mind that Evans was the voice saying, "No, you're not;" "Sit on the bed;" and "Jerry, sit on the bed."

A trial court's decision to admit evidence is reviewed under the abuse of discretion standard. Hudson v. State, 992 So. 2d 96, 107 (Fla. 2008). "That discretion, however, is limited by the rules of evidence." Id. Relevant testimony is inadmissible where its probative value is substantially outweighed by the danger of unfair prejudice. § 90.403, Fla. Stat. (2014). If the trial court erred in admitting certain evidence, we review whether the error was harmful, focusing on the effect that the error had upon the trier-of-fact. Gregory v. State, 118 So. 3d 770, 782 (Fla. 2013). "In other words, '[t]he question is whether there is a reasonable possibility that the error affected the verdict.' " Id. (quoting State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986)).

This Court has held that testimony that a lay witness recognizes a voice as belonging to the accused is admissible as proof of identity. England v. State, 940 So. 2d 389, 400-01 (Fla. 2006). However, testimony that a witness recognizes the

voice of the accused is inadmissible on the basis that it invades the province of the jury unless the testifying witness (1) was an eyewitness to the crime, (2) has some prior special familiarity with the voice of the defendant, or (3) is qualified as an expert in identification.  See, e.g., Charles v. State, 79 So. 3d 233, 235 (Fla. 4th DCA 2012); Ruffin v. State, 549 So. 2d 250, 251 (Fla. 5th DCA 1989).

In numerous cases, courts have permitted a witness to identify a defendant's voice or image where the witness in question was previously familiar with the defendant.  For example, the Second District Court of Appeal has held that the State could present two witnesses to testify that the voice they heard on a recording belonged to the defendant, noting that these witnesses had known the defendant "for a significant period of time" and had spoken to the defendant in person and over the telephone.  State v. Cordia, 564 So. 2d 601, 601-02 (Fla. 2d DCA 1990); see also Hardie v. State, 513 So. 2d 791, 792 (Fla. 4th DCA 1987) (holding that police officers who had prior knowledge and contact with the defendant before the crime at issue could testify as to the defendant's identity so long as they did not identify themselves as police).

In contrast, in Ruffin, 549 So. 2d at 251, the State presented the testimony of three police officers, over objection, who opined that the defendant was the person in a video shown to the jury even though they had no prior knowledge of the defendant.  The Fifth District Court of Appeal held that this opinion testimony

- 15 -

invaded the province of the jury because "[w]hen factual determinations are within the realm of an ordinary juror's knowledge and experience, such determinations and the conclusions to be drawn therefrom must be made by the jury." Id. In determining that the defendant was entitled to a new trial, the district court stressed that the opining officers "were not eyewitnesses to the crime, they did not have any special familiarity with Ruffin, and they were not qualified as any type of experts in identification." Id.

Similarly, in this case, Detective Judy was not an eyewitness to the crime, nor was he qualified as a voice identification expert. Therefore, the only basis upon which his identification of Evans as the voice on the 911 call-back recording could have been admissible was if he had already possessed a special familiarity with Evans' voice. Detective Judy testified that he had listened to known recordings of Evans' voice from jail conversations and was able to recognize his voice based upon these recordings. This, however, did not amount to a prior special familiarity.

While the dissent relies on Vilsaint v. State, 127 So. 3d 647, 648 (Fla. 4th DCA 2013), for the proposition that a police officer can identify a defendant's voice on a recording based on later conversations, that case concerns a trial judge's determination of whether the recording can be authenticated and thus presented to the jury—it does not involve a police officer testifying to the jury itself that the

- 16 -

defendant's voice sounds like the same voice on a recording that documented the murder. We find that case factually distinguishable. Other cases relied upon by the dissent involve a prior special familiarity with the defendant before the charged crime. See, e.g., Barrientos v. State, 1 So. 3d 1209, 1212 (Fla. 2d DCA 2009) (deputy had prior familiarity with the defendant); Cordia, 564 So. 2d at 601 (officers who had known the defendant "for a significant period of time," and who had spoken to him in person, over the telephone, and via police radio were permitted to identify the defendant's voice on a recording even if they were not the individuals who received the original telephone call). However, a police officer investigating a particular suspect's voice after the investigation is ongoing, as in this case, does not constitute the requisite prior familiarity with the suspect. Thus, we conclude that it was error for the trial court to permit Detective Judy to opine that the voice on the recording belonged to Evans when he did not have prior familiarity with Evans or special training in voice recognition.

Further, this error was magnified by the fact that the jury was aware Detective Judy was the lead detective investigating this case. As we have previously explained, "error in admitting improper testimony may be exacerbated where the testimony comes from a police officer." Martinez v. State, 761 So. 2d 1074, 1080 (Fla. 2000). "When a police officer, who is generally regarded by the jury as disinterested and objective and therefore highly credible, is the

- 17 -

corroborating witness, the danger of improperly influencing the jury becomes particularly grave." Id. (quoting Rodriguez v. State, 609 So. 2d 493, 500 (Fla. 1992)). "There is the danger that jurors will defer to what they perceive to be an officer's special training and access to background information not presented during trial." Charles, 79 So. 3d at 235.

In fact, permitting questions that elicit a witness's position as a police officer when that witness is identifying a defendant's voice or image has been held to be reversible error even when the identification itself was permissible. In Day v. State, 105 So. 3d 1284, 1286-87 (Fla. 2d DCA 2013), the district court held that a law enforcement officer could testify as to her opinion that the defendant was one of the people in a surveillance video because the witness testified that she previously knew the defendant and could independently identify her—she was a "community-oriented police officer" for a specific area of town and, as part of her job, she knew many of the residents, including the defendant. Even though she had familiarity with the defendant, the district court concluded that the trial court committed reversible error, nevertheless, in permitting the State to also elicit evidence that the witness was a police detective. Id.; see also Hardie, 513 So. 2d at 792 (reversing convictions and holding that police officers who had prior knowledge and contact with the defendants could testify as to the defendants' identity but could not identify themselves as police).

In this case, the trial court applied the wrong analysis when it reasoned that the State could introduce Detective Judy's voice identification because it was not "prejudicial" but merely cumulative to testimony from Beth's daughter and Ashby, the next door neighbor. The correct analysis was whether Detective Judy's testimony was independently admissible. Moreover, while Molly was Evan's stepdaughter and Ashby was the next door neighbor, Detective Judy, as the lead detective, lent an aura of expertise to the voice identification precisely because of his status as the law enforcement officer in charge of the investigation, adding the imprimatur of his belief in the defendant's guilt. Therefore, the trial court erred when it admitted the opinion testimony of the lead detective and concluded that the testimony would not be "prejudicial" because Molly and Ashby had already identified the voice as that of Evans.

Since Evans objected to the admission of this evidence, this error is subject to a harmless error analysis. See State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). We would consider whether the erroneous admission of Detective Judy's testimony was harmless beyond a reasonable doubt, standing alone, but because we conclude that other preserved errors also occurred, we consider the effect of the preserved errors cumulatively to determine whether there is any reasonable possibility that the errors contributed to the conviction. See McDuffie v. State, 970 So. 2d 312, 328 (Fla. 2007).

## II. Insinuations Regarding Hiring a Private Investigator

In the next claim we address, Evans asserts that the trial court erred in denying his motion for a mistrial and declining to give a curative instruction after the State insinuated that Evans hired a private investigator to investigate Gerald Taylor. During cross-examination, the following dialogue occurred between the prosecutor and Evans:

> STATE: Your testimony today is you did not know that name of the person [Beth] was going to—she was seeing?
>
> EVANS: I did not know the name of the person that she was seeing that night. I knew it as a date.
>
> STATE: And isn't it true you pressed her to get the information about [Taylor]?
>
> EVANS: I don't recall having a conversation like that, sir.
>
> STATE: Do you recall telling her that you actually knew where he lived and how many kids he had?
>
> EVANS: I don't recall that I knew anything about Gerald Taylor, sir.
>
> STATE: Isn't it true that you hired a private investigator to find out information about . . . Taylor prior to December 20th of 2008?
>
> EVANS: No, sir.

After the State presented Detective Judy as a rebuttal witness, defense counsel moved for a mistrial on the above questions, arguing:

> [T]here has been no evidence of any kind that has been presented that would suggest that that statement was true. And what it has done now is it's before this jury ["]isn't it a fact that you hired a private investigator to go out and learn about and research Jerry Taylor, which, obviously, implies that you went to the extreme of hiring

somebody because you were stalking Beth and that you were trying to get information about his guy that she was seeing before the homicide occurred.["] And [Evans] answered no, and there's been no evidence at all presented that that could be a true statement.

The prosecutor offered the following explanation for the question:

I totally had a good faith basis to ask it. I guess I should have known what his answer would be because, as you know, I don't have access to the Defendant. But there had been information from the victim in this case that she had told other people, which would be hearsay, that she believed that the Defendant had hired a private investigator because the morning of December 20th when he was pressing her about who she was going out with that night, and she finally said Jerry Taylor, he then told her where he lived and how many children he had. So she believed that he had hired a private investigator.
So that is the reason that I asked him that question. I didn't really expect him to answer it truthfully, but I certainly had a good faith basis in asking it. . . . I wasn't just making stuff up to try to make him look bad. There was an actual basis in fact why I asked it.

The trial court denied both the motion for mistrial and defense counsel's request for a curative instruction.

This Court recently held that "[i]t is impermissible for the state to insinuate impeaching facts while questioning a defense witness without evidence to back up those facts." Braddy v. State, 111 So. 3d 810, 853 (Fla. 2012) (quoting Shimko v. State, 883 So. 2d 341, 343 (Fla. 4th DCA 2004)). We recognized that this principle held true regardless of whether the State insinuated impeaching facts and never had proof of those facts or whether that evidence did exist, but was not later proved. Id.

- 21 -

The Third District Court of Appeal has explained why such insinuation is impermissible without later presenting proof of the underlying facts:

> The reason that such proof must be forthcoming is because the predicate question—e.g., 'Didn't you tell me . . .?' or 'Didn't you say to so-and-so'—is itself testimonial, that is, the question suggests that there is a witness who can testify that such a statement was made. When this suggested witness is not actually called to give the impeaching testimony under oath, all that remains before the jury is the suggestion—from the question—that the statement was made. When that occurs, the conclusion that must be drawn is that the question was not asked in good faith, and that the attorney's purpose was to bring before the jury inadmissible and unsworn evidence in the form of his questions to a witness.

Marrero v. State, 478 So. 2d 1155, 1157 (Fla. 3d DCA 1985) (emphasis omitted).

In this case, the State stresses that the prosecutor asked the question in good faith—an assertion that, even if relevant, is not supported by the record. The prosecutor's basis for this question was that Beth had told others that she "believed" Evans had hired a private investigator. This comment was purely speculative, and the reasons behind her belief could not be explored after her death. Further, the prosecutor recognized that the information he sought to elicit was based on hearsay and was inadmissible.

Had the prosecutor provided evidence to impeach Evans in response to his denial that he hired a private investigator, this line of cross-examination may have been permissible. However, the prosecutor never revisited the subject or produced impeachment evidence. Therefore, the prosecutor's insinuations arguably left the

jury with the damaging impression that Evans stalked Beth and was so obsessed with her that he hired a private investigator to acquire information about her new boyfriend. This line of questioning, which was not supported by any evidence, was improper. See Braddy, 111 So. 3d at 853. The dissent fails to reconcile its position that this type of questioning should be permissible with our holding in Braddy—thus, its reliance on the Fourth District's opinion in Carpenter v. State, 664 So. 2d 1167, 1167 (Fla. 4th DCA 1995), which was decided well before Braddy, is misplaced. Further, Carpenter is distinguishable because, prior to asking the insinuating question, the State could have called a witness to support its insinuation and, in fact, had that witness's written statement at the time the prosecutor asked the question. Here, the evidence the State relied upon to ask the insinuating question was inadmissible hearsay, and there was no evidentiary basis, beyond the hearsay itself, to support the question.

Not only was the State permitted to ask these improper questions, but this line of questioning targeted a key issue that the jury was required to resolve— whether the murders of Beth and Taylor were premeditated. The evidence pertaining to this question was highly contested. The jurors had heard mixed testimony as to whether Evans had accepted the dissolution proceedings that Beth initiated, or if he was trying to save his marriage and reconcile with her. These improper questions planted a seed in the minds of the jurors that Evans was a

stalker who secretly investigated Beth's new boyfriend to determine where he lived. These unsubstantiated allegations would give jurors the impression that Evans was obsessed with his estranged wife, and this could have played a role in their conclusion that the murders were premeditated. It could have also been considered by the jury in determining that Evans entered Beth's home with the intent to commit a felony.

Accordingly, because the trial court erred in permitting the State to ask these improper questions, we must consider the cumulative effect of this preserved error, along with the other preserved errors, to determine whether there is any reasonable possibility that the errors contributed to the conviction.

### III. Guilt-Phase Closing Arguments

Evans next alleges that during guilt-phase closing arguments, the prosecutor improperly commented on Evans' right to a jury trial, misstated the law, and denigrated Evans and his defense. Many of these comments occurred during the State's rebuttal—the last opportunity for the jury to hear the attorneys speak about the case and the conclusions to be drawn from the evidence.[7]

---

7. The prosecutor who presented the rebuttal closing statement, William A. Loughery, has "pushed the envelope" in other cases. Sheridan v. State, 799 So. 2d 223, 225-26 (Fla. 2d DCA 2001). Mr. Loughery was previously chided by the Second District Court of Appeal for his arrogance and his inappropriate comments. Id. In Sheridan, the Second District stated:

- 24 -

As Evans acknowledges, defense counsel objected to some of the comments, but not all of them. He also unsuccessfully moved for a mistrial, based on some of the comments. Thus, three standards of review are relevant. For those closing

---

A troubling aspect of the trial was the prosecutor's conduct. Indeed, one of Sheridan's issues on appeal was that the trial court erred when it denied his motions for mistrial predicated upon <u>repeated prosecutorial misconduct in closing argument</u>. . . .

Mr. Loughery repeatedly made improper statements during closing argument, including the reference to a defense theory as "desperate." The trial judge felt that Mr. Loughery was challenging him to declare a mistrial. When the trial judge questioned Mr. Loughery on this point, he responded:

> Let me explain this. I certainly am not [attempting to have a mistrial declared], okay? And I hate to say this, but I will. You know, I have tried a lot of cases. I've never been reversed as a prosecutor for misconduct. Never. I've won most of my cases. I never had a conviction reversed. This is no different than things I might say in other cases.
>
> <u>Now, I don't know what your experience is with the prosecutors you've watched. Maybe they're a bunch of dishrags. I don't know. But what I'm doing is not improper, okay?</u>

We have set forth this comment to demonstrate the arrogant attitude displayed by the prosecutor during the trial of this extremely strong case. It was not necessary for Mr. Loughery to have "pushed the envelope" as he did. <u>But for the fact that the evidence was so overwhelming and that Sheridan was convicted of a lesser offense than that with which he had been charged, Mr. Loughery's statements and actions may well have resulted in this court reversing the conviction due to prosecutorial misconduct.</u>

<u>Id.</u> at 225-26 (emphasis supplied).

arguments where the defense objected to improper comments and the trial court erroneously overruled defense counsel's objection, we apply a harmless error test. See Snelgrove v. State, 921 So. 2d 560, 568 (Fla. 2005); Doorbal v. State, 837 So. 2d 940, 956-57 (Fla. 2003). Where counsel failed to raise a contemporaneous objection when improper closing argument comments were made, the unobjected-to comments must rise to the level of fundamental error, which has been defined as error that "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Brooks v. State, 762 So. 2d 879, 898-99 (Fla. 2000) (quoting McDonald v. State, 743 So. 2d 501, 505 (Fla. 1999)). Finally, where the trial court denied a motion for mistrial, we review that ruling under an abuse of discretion standard. See Carr v. State, 156 So. 3d 1052, 1066 (Fla.) (holding that if the prosecutor's comment was improper, any error was harmless beyond a reasonable doubt and the trial court did not abuse its discretion in denying the defense motion for mistrial on that basis), cert. denied, No. 14-9726 (Oct. 5, 2015); Belcher v. State, 961 So. 2d 239, 255 (Fla. 2007) (explaining that, where the trial court erroneously overrules an objection to improper prosecutorial comments, this Court reviews the comments for harmless error and the denial of the motion for mistrial based upon the comments for abuse of discretion).

On appeal, this Court must review "the entire closing argument with specific attention to the objected-to arguments and the unobjected-to arguments." Card v. State, 803 So. 2d 613, 622 (Fla. 2001); see also Merck v. State, 975 So. 2d 1054, 1061 (Fla. 2007). As this Court has explained, "A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion. We look at the closing argument as a whole to determine whether that discretion was abused." Merck, 975 So. 2d at 1061.

We address each challenge separately and then discuss the cumulative impact of any improper comments.

### A. The Prosecutor's Erroneous Statement of the Law

Evans asserts that during guilt-phase closing arguments, the prosecutor misstated the law when he informed the jurors that a killing in the heat of passion qualifies as second-degree murder, failing to acknowledge that a heat of passion killing can also constitute manslaughter. When the prosecutor explained why the crimes were first-degree offenses and did not satisfy the criteria for second-degree murder, he stated:

> What varies greatly in this case is a second-degree murder is not one of premeditation. It is one that the law instructs you that it is an act done by—imminently dangerous to another or demonstrating a depraved mind without regard to human life. And it's often referred to in society as one of heat of passion and one of a—I guess, the heat of passion is how it's described out in society.
> I will suggest there is one major fact in this case that allows you to say this is not second-degree murder. This is not heat of passion

because of the main fact of where this occurs. It occurs in the bedroom of Elizabeth Evans. Okay?

. . . .

You can't bring—you can't subject yourself to the situation. You can't run into the house with a gun knowing they are out on a date, and divorce proceedings are pending, and somehow claim that I am so outraged by what I saw, I pulled out a gun and I started firing at people. Because I was so blinded by my passion and anger, I just pulled out a gun and in a depraved mind started shooting it at these individuals.

(Emphasis supplied.) Evans did not object. With regard to manslaughter, the prosecutor stated only:

Ladies and gentlemen, there is one final lesser included. I'm not going to go in depth into it. It's one of manslaughter. Reading the instruction on manslaughter, you will find that the evidence in this case goes way beyond manslaughter.

It is error for a prosecutor to misstate the law during closing arguments. See, e.g., Brooks, 762 So. 2d at 902; Charriez v. State, 96 So. 3d 1127, 1127 (Fla. 5th DCA 2012). In Johnson v. State, 969 So. 2d 938, 952 (Fla. 2007), this Court addressed "heat of passion" and explained:

The jury could have concluded from this evidence that Johnson acted not from premeditation but from a depraved mind regardless of human life or in the heat of passion, which would make the killing second-degree murder or manslaughter. Cf. Douglas v. State, 652 So. 2d 887, 890 (Fla. 4th DCA 1995) ("[A] jury can find a defendant who has killed in the heat of passion guilty of either second degree murder or manslaughter . . . .") (citing Forehand v. State, 171 So. 241 (Fla. 1936)).

See also Villella v. State, 833 So. 2d 192, 195 (Fla. 5th DCA 2002) (noting that heat of passion "can be used as a partial defense, to negate the element of

- 28 -

premeditation in first degree murder or the element of depravity in second degree murder"). Thus, Evans is correct that the prosecutor failed to inform the jury that under Florida law, a heat of passion killing can also constitute manslaughter and not just second-degree murder. When reviewing closing arguments, this Court considers the cumulative effect of all improper arguments, including the objected-to and unobjected-to closing arguments. See Merck, 975 So. 2d at 1062; Brooks, 762 So. 2d at 898-99 (considering cumulative effect of numerous instances of both objected-to and unobjected-to improper prosecutorial comment).

## B. Right to a Jury Trial

Evans next asserts that the prosecutor impermissibly commented on his right to a jury trial:

> So we looked at some financials of Andrea to suggest—you know, folks, when you got a guy on tape doing a murder and using his gun, I'm going to suggest there is not a lot you can argue. This is what America is about. Everybody has a right to a jury trial.
> . . . .
> So in America everybody has a right to a jury trial regardless of the evidence against you. It could be on videotape. It could be in front of a hundred priests. You have a right to a jury trial.

(Emphasis supplied.) Defense counsel objected and moved for a mistrial after the first comment, contending that the prosecution was denigrating the defense. The trial court overruled the objection and denied the motion for mistrial. No objection was raised to the second comment.

- 29 -

It is improper for a prosecutor to comment on a defendant's exercise of his right to a jury trial. Bell v. State, 723 So. 2d 896, 897 (Fla. 2d DCA 1998) (holding that the trial court erred when it overruled an objection to the prosecutor's comment that the "only one reason we're here" was because the defendant had the right to a jury trial); Johns v. State, 832 So. 2d 959, 962-63 (Fla. 2d DCA 2002) (stressing that it was improper for the prosecutor to disparage the defendant for having exercised his right to a jury trial and holding that the defendant was entitled to a new trial based on that comment, in addition to other improper comments). Here, the prosecutor asserted that the defense theory was weak, saying "there is not a lot [Evans] can argue." He then followed up by saying that no matter how strong the evidence is against a criminal defendant, he or she still has a right to a jury trial in America, using the videotape and the "hundred priests" examples.

Although the State contends that the prosecutor was merely referencing a truism of American constitutional rights, this begs the question why the prosecutor felt it was even necessary to reference the right to a jury trial in America—not once but twice, the second time after defense counsel moved for a mistrial. While referencing this right may at times fall within the "wide latitude" that is given to attorneys during closing arguments, Merck, 975 So. 2d at 1061, these comments were similar to those held to be improper in Bell because they were specifically directed at Evans' decision to seek a jury trial despite the significant incriminating

evidence against him.  Such a comment negatively reflected upon Evans' exercise of his constitutional right because it suggested that he wasted the time of the court and the jury by seeking a jury trial.

Thus, both of the comments were improper, and the trial court abused its discretion when it overruled defense counsel's objection to the first comment.  We address the cumulative impact of these errors below.

### C.  Reliance on Facts Not in Evidence & Improper Comments that Denigrated the Defendant or Defense

Evans presents multiple preserved and unpreserved challenges to the guilt-phase closing arguments in which the prosecutor either relied on facts not in evidence or denigrated the defense.  We hold that three of these comments were improper.

First, he points to a comment regarding homicides committed by family members, where the prosecutor relied on facts not in evidence to suggest that the victim was more likely murdered by a family member:

> Now, what do you think goes through the police's head at that point?  Before they know anything else, they would say—common sense would tell you, she's got an estranged husband.  We better look into that.  There you go.  Maybe.  Maybe that person did it.  Or maybe he's a suspect.  He's suspected.  <u>Because we need to find out because, as you all know, most homicides are committed by family members or friends</u>.

(Emphasis supplied.)  The trial court overruled defense counsel's objection to this comment.

- 31 -

This Court has explained that "[a] criminal trial is a neutral arena wherein both sides place evidence for the jury's consideration; the role of counsel in closing argument is to assist the jury in analyzing that evidence, not to obscure the jury's view with . . . nonrecord evidence." Ruiz v. State, 743 So. 2d 1, 4 (Fla. 1999) (emphasis supplied). The statement that, statistically speaking, Beth was most likely murdered by a family member was an improper comment. The trial court abused its discretion when it overruled this objection.

Evans also challenges numerous comments that denigrated the defense or defense attorneys as a whole. In arguing to the jury, the prosecutor stated the following:

> And it's amazing that [defense counsel] suggests the reason [Evans] is not guilty is because there is evidence against him. Okay? Because the shell [casings] are there, he clearly didn't do it because he would have picked them up. I mean, only in a world populated by defense attorneys would that be true.

(Emphasis supplied.) Defense counsel both objected and moved for a mistrial based upon this comment. Although the trial court did not specifically rule on the objection, it denied the motion for mistrial.

In addition, the prosecutor implied to the jury that the defense's theory was so far-fetched and unbelievable that it would not even be written for a television series. Like the prior comment, this comment addresses the theory of the

- 32 -

defense—specifically, that someone else may have been responsible for the

murders:

> But the defense of this, I suggest, is that somebody else did that
> and intentionally left the stuff so the police would believe that [Evans]
> did it, that he's being framed . . . .  What a clever frame these people
> had that they could—this real murderer, that he could get Beth and
> Jerry to go along with this perfect script where they actually called
> him Rick and they could scream and do all this stuff.  And they had it
> on the 911 tape.
> And he could kill them and then he could leave the holster and
> leave the casings so they would think—because they stole the gun
> from Rick earlier so that they would think that Rick did it.  <u>I mean,
> talk about bad TV.  That wouldn't even make it on TV</u>.

(Emphasis supplied.)  Counsel objected and moved for a mistrial.  The trial court

overruled the objection and denied the motion.

A prosecutor is not permitted to denigrate the theory of the defense.  <u>Jackson</u>

<u>v. State</u>, 147 So. 3d 469, 486 (Fla. 2014).  This comment is inappropriate, not only

towards counsel and the theory of the defense, but towards all defense attorneys in

general.  In fact, the comment is more egregious than in recent cases where we

have cautioned the prosecution against making disparaging comments, including

when the prosecutor referred to the defense as "grasping [at] straws," <u>see id.</u>, or

asserted that defense counsel must have been "in a different trial" because "[t]heir

arguments make absolutely no sense," <u>Braddy</u>, 111 So. 3d at 838.  <u>See also</u>

<u>Sheridan</u>, 799 So. 2d at 225 (expressing concerns over improper prosecutorial

- 33 -

comments that a defense strategy was "desperate"). Accordingly, the trial court should not have permitted such comments.

If improper comments are made during closing arguments, the Court "considers the cumulative effect of objected-to and unobjected-to comments when reviewing whether a defendant received a fair trial." Merck, 975 So. 2d at 1061. Here, the prosecutor (1) made erroneous statements of the law; (2) commented multiple times on Evans' decision to exercise his right to a jury trial; (3) relied on facts not in evidence; and (4) denigrated and ridiculed not only the theory of the defense, but all defense attorneys.

We next consider the cumulative effect of all of the errors addressed above.

## IV. Cumulative Error During the Guilt Phase

Having concluded that multiple errors occurred in this case, we proceed to consider the cumulative effect of those errors to determine whether those errors are harmless. See McDuffie, 970 So. 2d 328 (conducting a cumulative harmless error analysis where multiple preserved errors occurred). Harmless error analysis places the burden upon the State, as beneficiary of the errors, to prove there is "no reasonable possibility that the error contributed to" the defendant's conviction. DiGuilio, 491 So. 2d at 1138. As we have repeatedly stressed, the harmless error test "is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an

overwhelming evidence test" but the "focus is on the effect of the error on the trier-of-fact." Id. at 1139.

Here, Evans has identified three preserved errors—(1) improper voice identification that invaded the province of the jury; (2) unsubstantiated, incriminating questioning of Evans that implied the defendant stalked the victim's current boyfriend; and (3) preserved objections to improper closing arguments, including criticizing the defendant's exercise of his right to a jury trial, denigrating the defendant's theory of defense, and relying on facts not in evidence. We consider the effect of the preserved errors cumulatively to determine if they could be considered harmless beyond a reasonable doubt. In addition, Evans also raises other unobjected-to improper closing arguments, including misstatements of the law and other comments that criticized the defense theory and his exercise of his right to a jury trial—errors which we also consider in this analysis.

In this circumstantial evidence case, Evans presented evidence that he had an alibi when the murders occurred. Further, he suggested other possible suspects who may have had the opportunity and ability to kill the victims. Even if the State had proven that Evans killed the victims, questions pertaining to whether the crime was a heat-of-passion murder or whether the murders were premeditated or committed during a felony where hotly contested. These were questions for the jury to determine, and many of the errors went straight to the heart of these issues.

We conclude that the preserved errors that occurred in this case, when viewed cumulatively, cannot be considered harmless beyond a reasonable doubt. Allowing the police officer to identify Evans as the voice in the 911 recording, despite his prior lack of knowledge of Evans, invaded the province of the jury—an error that was exacerbated by the fact that the jury knew the witness was the lead detective in the case. Further, by permitting the prosecutor's insinuating questioning of Evans in an apparent attempt to introduce evidence that was not otherwise admissible, the questions pertaining to Evans' supposed hiring of a private investigator embedded the image of Evans as a stalker in the minds of the jurors. Finally, in closing arguments, the prosecutor made numerous improper arguments, relying on facts that were not in evidence, making multiple sarcastic and denigrating comments that disparaged the defendant's theory of the case and defense attorneys as a whole, and strongly implied that Evans was wasting the time of the court and the jurors by requesting a jury trial on a weak defense—comments that this Court has consistently disapproved. Each of these errors is significant in its own right. The existence of the unpreserved errors buttresses our conclusion that Evans is entitled to a new trial.

Accordingly, we vacate Evans' convictions and sentences and grant him a new trial.

## V. Sufficiency of the Evidence

Although we have concluded that reversible error occurred, this Court must analyze the sufficiency of the evidence because if there is insufficient evidence on which to convict Evans of these murders, it is our obligation to vacate the convictions with directions to grant judgments of acquittal. See McDuffie, 970 So. 2d at 329. Evans asserts that the trial court should have granted his motion for judgment of acquittal on premeditated first-degree murder because the State presented insufficient evidence of premeditation and the crimes were "heat of passion" killings. He also contends that the circumstantial evidence in the case was consistent with his reasonable hypothesis of innocence. We reject both contentions.

A trial court's ruling on a motion for judgment of acquittal is reviewed de novo. Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Floyd v. State, 850 So. 2d 383, 395-96 (Fla. 2002) (quoting Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974)). A trial court should grant a motion for judgment of acquittal in a circumstantial evidence case

> if the state fails to present evidence from which the jury can exclude
> every reasonable hypothesis except that of guilt. Consistent with the
> standard set forth in Lynch, [293 So. 2d 44], if the state does not offer
> evidence which is inconsistent with the defendant's hypothesis, "the

evidence [would be] such that no view which the jury may lawfully take of it favorable to the [State] can be sustained under the law." [Lynch,] 293 So. 2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R. Crim. P. 3.380.

It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.

Floyd, 850 So. 2d at 396 (quoting State v. Law, 559 So. 2d 187, 188-89 (Fla. 1989)) (emphasis omitted).

This Court has explained that premeditation is not just the intent to kill; it is "a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act." Bolin v. State, 117 So. 3d 728, 738 (Fla. 2013) (quoting Woods v. State, 733 So. 2d 980, 985 (Fla. 1999)). "Premeditation may be inferred from such facts as 'the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.' " Id. (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

- 38 -

Contrary to Evans' contention, the circumstantial evidence in this case was inconsistent with his reasonable hypothesis of innocence. The record reflects that on the night of the murders, Evans knew Beth was on a date with another man. Evidence suggested that he wished to reconcile with Beth, although she had filed a petition for dissolution of marriage. Someone who resembled Evans was spotted at the complex walking in the direction of Beth's residence approximately twenty-five minutes before the 911 hang-up occurred. The recorded conversation from the 911 call-back reflects the exact conversation and the murders as they occurred, demonstrating both the length of time in which the crime occurred, the lack of provocation, and the murderer's voice and verbal demeanor.

Additionally, the shell casings found near the bodies matched the test-fired casings recovered from Evans' safe and Beth called the shooter "Rick." The facts of this case, including bringing a firearm to Beth's house on a night when Evans knew she was on a date, the lack of provocation, and Evans' verbal demeanor during the murder, are inconsistent with a "heat of passion" theory. As this Court has previously held, "[i]n a circumstantial evidence case in which there is inconsistency between the defendant's theory of innocence and the evidence when viewed most favorably to the State, the question is for the finder of fact to resolve and the motion for judgment of acquittal must be denied." Floyd, 850 So. 2d at 397-99 (holding the trial court did not err in denying a motion for judgment of

acquittal in a circumstantial evidence case where the defendant asserted the murder could have been a "heat of passion" murder because his decision to bring a gun to the victim's house was inconsistent with his theory that he shot her in a moment of uncontrolled rage).

Based upon the circumstantial evidence in this case, we determine that the trial court did not err in denying the motion for judgment of acquittal regarding the charge of premeditated murder.

## VI. Burglary as the Underlying Felony as a Basis for First-Degree Felony Murder

We conclude by addressing Evans' argument that the trial court erred in denying the motion for judgment of acquittal on first-degree felony murder and erred in instructing the jury on burglary as the underlying felony as a basis for first-degree felony murder. We address this issue because, while we hold that Evans is entitled to a new trial, this issue is likely to arise in the retrial.

According to Evans, the State failed to establish that he lacked consent to enter Beth's condominium on the night of the murders and, therefore, the underlying crime of burglary was not proven. The burglary statute provides as follows:

> (b) For offenses committed after July 1, 2001, "burglary" means:
> 1. Entering a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter; or

2. Notwithstanding a licensed or invited entry, remaining in a dwelling, structure, or conveyance:
   a. Surreptitiously, with the intent to commit an offense therein;
   b. After permission to remain therein has been withdrawn, with the intent to commit an offense therein; or
   c. To commit or attempt to commit a forcible felony, as defined in s. 776.08.

§ 810.02 (1)(b), Fla. Stat. (2008). The Florida Legislature has specifically stated that consent is an affirmative defense to the crime of burglary, and "the lack of consent may be proven by circumstantial evidence." Aguirre-Jarquin v. State, 9 So. 3d 593, 605 (Fla. 2009) (quoting § 810.015(3), Fla. Stat. (2004)). In circumstantial evidence cases, the trial court must grant a judgment of acquittal if the State has failed to present evidence from which a jury could exclude every reasonable hypothesis except that of guilt. Walker v. State, 957 So. 2d 560, 577 (Fla. 2007).

Here, there is no dispute that Evans was permitted entry into Beth's condominium on occasion. For example, he would visit to drop off and pick up his son. Because Beth is deceased, there is no direct evidence that Evans' entry that night was without her consent, other than Molly's testimony that Evans' prior entries into the home without knocking troubled her mother.

Circumstantial evidence, however, establishes a lack of consent because every other reasonable hypothesis can be excluded. The record reflects that Beth and Taylor were nude in the master bedroom at the time Evans entered the

- 41 -

residence. It is highly unlikely that Beth would consent to her estranged husband—or anyone else—entering her residence during such an intimate moment. While Evans claims that the front door was unlocked, even if true, this would not translate into an invitation for Evans to enter at that time.

Any purported belief by Evans that he thought consent existed for him to enter the home that night is equally strained. Evans told Ashby that Beth was on a date that night. Upon approaching the condominium, Evans would have observed Taylor's vehicle in the driveway and realized that Beth had company that night, most likely her date. Based on the timing of the 911 call and the testimony from Graham, who asserted somebody resembling Evans was near Beth's condominium around 6:45, Evans had sufficient time to observe events transpiring inside Beth's residence. Yet, he entered the residence, armed with a gun.

Under these facts, the trial court properly denied the motion for judgment of acquittal on the felony-murder charge and instructed the jury on burglary as the underlying felony as a basis for first-degree felony murder.

## CONCLUSION

Based on the reasons explained in this opinion, we conclude that cumulative error occurred that is not harmless beyond a reasonable doubt, thereby necessitating a new trial. Accordingly, for the reasons stated in this opinion, we vacate Evans' convictions and sentences and remand for a new trial.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, and PERRY, JJ., concur.
LEWIS, J., dissents with an opinion, in which POLSTON, J., concurs.
CANADY, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

LEWIS, J., dissenting.

I dissent from the majority opinion and would affirm the convictions of first-degree murder and sentences of death. In my opinion, the testimony of Detective Judy that identified Evans as the voice on the 911 call-back recording was admissible, and the question as to whether Evans had hired a private investigator was not inappropriate. Further, while I do not dispute that the prosecution made multiple inappropriate comments during guilt-phase closing statements, I do not believe that any of these comments, individually or cumulatively, rose to the level of reversible error. I write specifically to discuss the voice identification and private investigator claims.

## Voice Identification

The identification of a defendant based solely upon his or her voice is admissible as direct and positive proof of a fact, and the probative value of the identification is a question for the jury. See Martin v. State, 129 So. 112, 115 (Fla. 1930). Voice identification testimony may be inadmissible on the basis that it invades the province of the jury where a testifying witness (1) was not an

- 43 -

eyewitness to the crime, (2) does not have a special familiarity with the defendant's voice, or (3) is not qualified as an expert in voice identification. See, e.g., Charles v. State, 79 So. 3d 233, 235 (Fla. 4th DCA 2012) (quoting Ruffin v. State, 549 So. 2d 250, 251 (Fla. 5th DCA 1989)). Contrary to the conclusory statement by the majority, Detective Judy did indeed possess a special familiarity with Evans' voice and, therefore, the trial court properly allowed him to identify Evans as the speaker on the 911 call-back recording. Any challenge to this testimony is directed to weight, not admissibility.

Detective Judy's familiarity arose from the fact that he listened to known recordings of Evans' voice from jail conversations with family members. Further, the record reflects that he listened to the calls in an investigative capacity. During a 2010 deposition, when asked if he heard anything "of value" on the jail recordings with regard to the double homicide, Detective Judy stated that Evans made no admissions or confessions. However, he observed the following:

> [T]he first thing that [Evans] says on the calls is, no names. But from listening to the tapes and listening to the 911 call, I easily recognize Rick's voice. I also recognize the voices of his brothers Glenn, Rodney and his mother Marcia. There's no problem there. So I would think that that would be of value to the case. And also that he's always called Rick on all the tapes, when they did use names. And every now and then Rodney slips and throws in a Rick there, which very much upsets him.

Thus, by listening to the jail recordings, Detective Judy learned that (1) family members call Evans by the name Rick; (2) Evans attempted to dissuade them from

- 44 -

using this name during the recorded calls; and (3) Evans became upset when family members referred to him as Rick.

This testimony demonstrates that Detective Judy did not listen to the jail recordings simply to identify Evans' voice on the 911 call-back recording during trial. Rather, as the lead detective in the case, he gained a special familiarity with Evans' voice in the course of his investigative duties; i.e., to obtain further evidence which would corroborate Evans' participation in the double homicide. Therefore, I would conclude that Detective Judy clearly met the threshold for admissibility of the identification.

Moreover, Florida courts have consistently allowed law enforcement officers to identify the voice of a defendant where the officer has gained familiarity with the voice. In Vilsaint v. State, 127 So. 3d 647, 648 (Fla. 4th DCA 2013), a detective was permitted to identify Vilsaint's voice on a jail telephone recording where the detective had engaged in a brief conversation with him. Id. Based upon the identification, the trial court admitted the recording, in which Vilsaint made incriminating statements. During trial, the detective admitted that the identification was based on approximately thirty-six words, mostly "yes" and "no." Id. at 649. Further, while Vilsaint spoke to the detective in English, the recorded conversation was in Creole. Id. In affirming the trial court's admission of the identification, the Fourth District Court of Appeal stated:

> Here, the detective spoke to appellant for approximately ten to fifteen minutes prior to appellant being put in the cell. He said that based upon this he could identify appellant's voice on the tape. This was sufficient to satisfy authentication, and the trial court did not abuse its discretion by overruling defense counsel's objection to the identification. <u>The jury could determine for itself the credibility of that identification.</u>

<u>Id.</u> at 650 (emphasis supplied).

Similarly, in <u>Barrientos v. State</u>, 1 So. 3d 1209, 1211 (Fla. 2d DCA 2009), a law enforcement officer was allowed to testify that the voice recorded on an electronic listening device worn by a confidential informant was that of Barrientos based on the fact that the officer had heard his "deep, raspy voice" during a single encounter that had occurred approximately four years earlier. Counsel for Barrientos asserted it was implausible that the officer would remember the sound of Barrientos' voice under such circumstances. <u>Id.</u> at 1212-13. The Second District Court of Appeal held that the officer's testimony was admissible, but explained that the credibility of that evidence was a jury question. <u>Id.</u> at 1213; <u>see also</u> <u>Worley v. State</u>, 263 So. 2d 613, 613 (Fla. 4th DCA 1972) (officer who received anonymous bomb threats was permitted to identify the defendant by voice as the person who placed the calls; the Fourth District noted that "[t]he credibility of such evidence is clearly a jury question").

Even in the cases relied upon by the majority, the district courts have held that identifications by police officers are permissible where the officers have

gained a special familiarity with the defendant. In State v. Cordia, 564 So. 2d 601, 601 (Fla. 2d DCA 1990), the Second District granted a petition for writ of certiorari and quashed the portion of a trial court order that excluded the voice identification testimony of two police officers. Cordia was an officer who called the police department of a nearby municipality and submitted a false report that bombs had been planted there. Id. The officers whom the State sought to present knew Cordia and had spoken with him in person, over the telephone, and over a police radio, but they were not the officers who had received the call. Id. at 601-02. The Second District concluded that because the officers claimed to possess special knowledge of Cordia's voice characteristics, they could offer an opinion as to whether it was his voice on the call. Id. at 602. Conversely, in Ruffin, 549 So. 2d at 251, the Fifth District reversed the defendant's convictions on the basis that the identification of Ruffin by three officers as the man on a videotape selling cocaine was improper. However, the Fifth District specifically noted that the officers did not possess a special familiarity with Ruffin. Id.; see also Charles, 79 So. 3d at 235 (holding it was error to allow a detective to testify that it was Charles who appeared on a surveillance video where the detective had no special familiarity with Charles).

In Day v. State, 105 So. 3d 1284, 1286-87 (Fla. 2d DCA 2013), and Hardie v. State, 513 So. 2d 791, 792 (Fla. 4th DCA 1987), the district courts also held that

police officers could offer opinions as to whether the defendants were the individuals depicted on video recordings committing crimes where the officers had prior knowledge of or contact with the individuals. The convictions in these cases were reversed only because the officers identified themselves to the jury as such and, therefore, rendered it "inconceivable" that the jury would not conclude the defendants had been involved in other criminal activities. Day, 105 So. 3d at 1288; Hardie, 513 So. 2d 793-94. Unlike Day and Hardie, however, Detective Judy became familiar with Evans' voice through his investigation of these homicides— not through investigations of any prior criminal activity by Evans, which could have suggested to the jury that Evans previously had engaged in criminal conduct. Therefore, Day and Hardie are totally distinguishable and do not support the proposition that Detective Judy should not have been allowed to identify Evans as the speaker on the 911 call-back recording.

Consistent with this precedent, it is apparent that the trial court did not commit an abuse of discretion because the record demonstrates that Detective Judy possessed a special familiarity with Evans' voice. See Overton v. State, 801 So. 2d 877, 896 (Fla. 2001) (an abuse of discretion does not occur "unless no reasonable person would take the view adopted by the trial court"). The probative value and credibility of Detective Judy's identification was a question for the jury. Martin,

129 So. at 115; <u>Vilsaint</u>, 127 So. 3d at 650, <u>Barrientos</u>, 1 So. 3d at 1213; <u>Worley</u>, 263 So. 2d at 613.

## Private Investigator

I would further conclude that the trial court properly denied Evans' motion for a mistrial and declined to give a curative instruction after the prosecutor asked Evans whether he had hired a private investigator to discover information about Taylor. A motion for mistrial should be granted only when the error is so prejudicial that the entire trial is vitiated. <u>England v. State</u>, 940 So. 2d 389, 401-02 (Fla. 2006).

In my view, this question was not inappropriate and, therefore, no error occurred. According to the prosecutor, Beth had informed multiple individuals that Evans had hired a private investigator. Her statements were supported by the fact that on the morning of December 20th, when she told Evans the name of her date, Evans informed her that he knew where Jerry Taylor lived and how many children he had. The fact that Evans confronted Beth with this information supported her statements that Evans hired someone to investigate Taylor. Therefore, I would conclude that the prosecutor possessed a good faith basis to ask this question.

Further, the prosecution was not required to introduce evidence during rebuttal to demonstrate that Evans had in fact hired a private investigator. In

Carpenter v. State, 664 So. 2d 1167, 1167 (Fla. 4th DCA 1995), the prosecutor

asked Carpenter, who claimed self-defense, whether he had told a third party that

he shot the victim because he was "sick and tired of the crap." After Carpenter

denied making the comment, the prosecutor attempted to approach Carpenter with

the written statement of the third party that contained the comment. Id. at 1167-68.

Thereafter, defense counsel objected on the basis of hearsay. Id. at 1168. The trial

court sustained the objection, denied a motion for mistrial, and instructed the jury

that a question is not evidence. Id. The prosecutor did not present the third party

as a witness on rebuttal or attempt to establish that the third party made the

statement. Id.

The Fourth District rejected Carpenter's assertion that the failure of the

prosecutor to prove the fact insinuated by the question demonstrated that the

prosecutor did not act in good faith. Id. at 1169. Instead, the district court

concluded that such a question is permissible where the trial court is satisfied the

prosecution has a good faith belief that the insinuated fact is true. Id. at 1167.

Further, the Fourth District noted that a respected legal treatise totally disagreed

with the rationale in Marrero v. State, 478 So. 2d 1155 (Fla. 3d DCA 1985), a

decision from which the majority quotes in support of its conclusion that the

private investigator question was inappropriate:

> Recently, two District Courts of Appeal have apparently added a new
> requirement to the use of prior inconsistent statements. In Marrero v.

- 50 -

State, it was held for the first time that if a witness denies making the prior inconsistent statement, counsel must prove that the prior statement was made. The court interpreted the requirement, that counsel have a good faith basis before a question could be asked which impeaches the credibility of a witness, as requiring the actual introduction of the statement. These opinions did not cite other authority nor do they logically flow from the "good faith requirement." . . . The logical result of the Marrero decision is to limit any cross-examination regarding credibility to situations in which counsel has "a witness-room full of witnesses prepared to give back-up testimony. Such an approach would unduly inhibit impeachment by imposing overwhelming burdens, delays, and expenses on showing good faith."

Carpenter, 664 So. 2d at 1168-69 (quoting Charles W. Erhardt, Florida Evidence, § 608.4 (1995 ed.)). I would conclude that both Carpenter, and the legal treatise upon which it relied, provide the more logical approach when a prosecutor asks an insinuating question in good faith, i.e., it is admissible, and the introduction of evidence to support the question is not required. Therefore, the trial court here properly denied the motion for mistrial because the prosecutor possessed a good faith basis to ask the private investigator question.

Additionally, even if the question had not been asked in good faith—which I believe it was—any error was harmless. First, the hiring of a private investigator is neither uncommon nor illegal. Contrary to the assertion of the majority, it does not constitute evidence of premeditation to commit murder or that Evans entered Beth's home with the intent to commit a felony. Second, the jury heard Evans refer to Beth's companion as "Jerry" on the 911 call-back recording, despite his

testimony that he did not know the name of the man Beth was seeing that night. This evidence demonstrated that Evans had somehow acquired Jerry's name prior to the 911 call-back. Although one explanation is that Evans did in fact hire a private investigator, other explanations were posited during closing statements. It was for the jury to determine which scenario to believe with regard to how the intruder knew Jerry's name.

## Conclusion

For the foregoing reasons, I would conclude that no reversible error occurred, and I dissent from the decision of the majority to grant Evans a new trial. Instead, I would affirm his convictions and sentences of death.

POLSTON, J., concurs.

CANADY, J., dissenting.

I agree with Justice Lewis's dissent with one exception. On the issue regarding the prosecutor's questions to Evans about the hiring of a private investigator, I would conclude that any error was harmless beyond a reasonable doubt.

An Appeal from the Circuit Court in and for Pinellas County,
    Richard A. Luce, Judge - Case No. 522008CF026829AXXXNO

Howard L. Dimmig II, Public Defender, and Cynthia Jean Dodge, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Christina Zuccaro, Assistant Attorney General, Tampa, Florida,

for Appellee